**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Scott SHELDON and Mitchell Paul Solomon, Defendants-Appellants.**

No. 76–1679.

United States Court of Appeals, Fifth Circuit.

Dec. 20, 1976.

Barry L. Garber, Daniel S. Pearson, Miami, Fla., for defendants-appellants.

Robert W. Rust, U. S. Atty., Barbara D. Schwartz, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, and TUTTLE and TJOFLAT, Circuit Judges.

TUTTLE, Circuit Judge:

Appellants appeal from their conviction on several counts of an indictment charging them with violations of narcotics laws. The indictment charged Solomon on all five counts of possession with intent to distribute, distribution, and with conspiring with Scott Sheldon to commit the substantive offenses. Sheldon was charged in two of the counts, of the conspiracy and the distribution of cocaine.

It is not disputed that through the participation by both Solomon and Sheldon, a sale was completed by another co-defendant Leaman in the apartment of a further co-defendant Brock. Only Solomon and Sheldon appeal in this case and their sole defense was entrapment. Now, on appeal, appellants claim reversible error occurred in three particulars: (1) The trial court, by excessive intervention, both by comment, and by questioning the defendants' witnesses, gave the jury an impression of bias favoring the Government; (2) that by a charge with respect to the effect of the admitted importunities by Government agents of the defendants, the trial court in effect directed a verdict against the defendants on the issue of entrapment; and, (3) a further part of the trial court's charge to the jury gave an incorrect statement of the effect to be given to the jury's inability to find guilt beyond a reasonable doubt.

In order better to understand the defense of entrapment, we think it appropriate to quote from an opinion by this Court in *United States v. Gomez-Rojas,* 507 F.2d 1213 (5 Cir. 1975):

"The United States Supreme Court first recognized and applied the entrapment defense in *Sorrells v. United States,*

1932, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413. In *Sorrells,* Chief Justice Hughes ruled for the Court that as a matter of statutory construction, the entrapment defense prohibits Government officials from instigating a criminal act by persons 'otherwise innocent in order to lure them to its commission and to punish them,' 287 U.S. at 448, 53 S.Ct. at 215, 77 L.Ed. at 413, reasoning that Congress passes criminal statutes to deter crime rather than encourage it. In 1958, in *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848, and again in 1973, in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366,[2] the Court reaffirmed the principle set out in *Sorrells*: that '[e]ntrapment occurs only when the criminal conduct was "the product of the *creative* activity" of law-enforcement officials.' *Sherman v. United States, supra,* 356 U.S. at 372, 78 S.Ct. at 821, 2 L.Ed.2d at 851. Thus, the entrapment defense turns on the intent or predisposition of the defendant to commit the crime. [Emphasis in original].

[2] In *Russell,* the Court stressed that the entrapment defense was of a statutory nature and not a constitutional one."

This Court further said in *Gomez-Rojas*:

"Once the defendant presents a prima facie case of entrapment indicating that Government conduct created 'a substantial risk that the offense would be committed by a person other than one ready to commit it,' *Pierce v. United States,* 5th Cir. 1969, 414 F.2d 163, 168, the burden shifts to the Government to prove beyond a reasonable doubt that the accused was predisposed to commit the crime charged against him," citing *United States v. Mosley,* 5th Cir. 1974, 496 F.2d 1012.

Some background is necessary for understanding the conduct of the trial court which is now alleged as error. Sheldon and Solomon had been friends since childhood. At the time of the sale of the narcotics involved here, they were both 26 years old. They were both employed and neither had a

criminal record. The Government introduced no evidence indicating a predisposition to deal in narcotics in any form prior to the events that will be outlined below. Both Sheldon and Solomon, residents of Miami, Florida, had been students at the University of Arizona and while in Tucson, Sheldon had met one Michael Chick, some six years previous to the sale now referred to.

At the end of July in 1975, Sheldon's friend Chick began calling him to tell him that he was coming down from Vero Beach where he lived to stay in Miami. On at least one occasion he told Sheldon he was coming to Miami for the purpose of buying cocaine. Sheldon testified that he told him "do what you want." Chick did come to Miami and presented himself to the Miami Drug Enforcement Administration in early August. DEA Agent Jose Roque who was later to become the active agent to work with Chick, described Chick as a "walk-in informant." Roque verified that Chick had been an informant with the Drug Enforcement Administration in Tucson for several months. In Miami, Chick stayed at the home of Drew and Carol Malamud, friends of the defendants. Both Sheldon and Solomon saw him there, although Sheldon more frequently. Sheldon testified that Chick repeatedly sought to get him to buy him some drugs, both by personal requests and by numerous telephone calls. He testified that Chick asked him about making a sale of cocaine between 20 and 30 times in a period of approximately two weeks and that he had told his friends, the Malamuds and Solomon, that Chick was "driving him up the wall." Solomon testified that Chick tried to persuade him to become involved in the drug deal and asked that he meet with "Joe" and told him of great sums of money to be made. Solomon says he responded that he was not interested. Chick tried on numerous times to call Solomon who failed to answer the telephone. After some two or three weeks of this importuning by Chick,[1] he dropped out of the picture and

1. All of the testimony about the repeated calls by Chick, given by Sheldon, Solomon and Malamud, was undisputed. Chick, the informer, although present in court, was not called by the Government to dispute the testimony of this harassment by him.

Roque began calling the two defendants. Sheldon testified that Roque called him six times seeking an opportunity to meet with him. Roque testified that he called Solomon four times and reached him twice. On the second conversation, Roque obtained an agreement from Solomon to meet him. The meeting was arranged. Solomon, accompanied by Sheldon, went through an elaborate procedure to satisfy themselves that Roque was a genuine purchaser. Then Solomon took Roque to an apartment where a quantity of cocaine was turned over to him. This resulted in the immediate arrest of both men.

## I. INTERVENTION BY THE TRIAL JUDGE

■ In their brief, appellants say that the trial court intervened 130 times during testimony being given by the defendants or their witnesses, whereas the brief states that "the court asked ten innocuous questions of Government witnesses." This is not disputed by the Government. As indicated in *United States v. Lanham,* 416 F.2d 1140 (5th Cir. 1969), the statistical count of interruptions by the trial court is of some significance in a case such as that now before us. However, it is the nature of the interruptions that appellants here principally complain of. The first challenge relates to the interruption of defense witness Malamud's testimony. Malamud had stated that while Chick was staying at his house he had seen him with a roll of bills of approximately $200 on three occasions and yet he testified that he had taken Chick to a pay phone numerous times and that Chick was always out of money and he remembered it because Chick always borrowed the dime from him to make the call. At this point the court interrupted as follows:

"THE COURT: So he had $600?

THE WITNESS: Right, at various times.

THE COURT: Over a period of two and a half weeks?

THE WITNESS: Three weeks, two and half to three weeks, right.

THE COURT: And every time you saw him he asked you for dimes for telephone calls?

THE WITNESS: Right.

THE COURT: So though he had $600 that you saw—

THE WITNESS: I didn't see it in one lump sum.

THE COURT: But you saw it on three different occasions?

THE WITNESS: Right."

The next interruption criticized by appellants, dealing with the same situation, occurred when Mrs. Malamud was on the stand. The following occurred:

"THE COURT: It would have been cheaper to put in a telephone than spend all that gas getting to it, wouldn't it?

THE WITNESS: I have a foreign car, it doesn't use much gas.

THE COURT: What kind of foreign car?

THE WITNESS: An MGB."

Further, the action of the trial court in interrupting defendant Solomon, when he was testifying on his own behalf, to point out that evidence given by him was in conflict with testimony previously given in the development of the Government's case, is, at the very least, an unusual procedure for a trial judge to employ. The Government's witness Roque had testified that Sheldon had made a search of him and had had him take his shirt off to search for a transmitter. Then when Solomon stated in reply to counsel's question why he requested this search, the court interrupted by saying:

"I do not recall any evidence that it was suggested to him. The only evidence I recall—and the jury will remember the evidence, it is not my recollection but theirs which control—that it was Mr. Sheldon that did the 'take the shirt off' routine or Mr.—yes, Mr. Sheldon."

Then, still during Solomon's testimony, his counsel asked him: "You were not able to find a transmitter of any type, were you?" To which Solomon answered: "No sir." Counsel then asked him: "You did

not even open the briefcase far enough to find what an agent has testified was in there, did you?" Solomon again answered: "No sir." Thereupon the court said: "As I recall the testimony counsel, the agent who testified, I think Charlie Brown, did not say that this was the witness who requested him to open a briefcase. He said it was Mr. Sheldon and that he opened it and exhibited to Mr. Sheldon, not to this witness."

While it was probably totally unimportant to know whether Sheldon or Solomon asked Brown to open the briefcase, the effect of both of these interruptions by the trial court was necessarily to indicate to the jury that if the Government witnesses testified contrary to what was then being said, then it was the Government's version of the facts that would control. Even where the court stated: "Well the jury will remember what the evidence is" that still implied that if the jury remembered the evidence as the court did, then those would be the controlling facts rather than whatever testimony was being given by the defense on the witness stand.

When Solomon was testifying as to to his responding to a telephone message sent to him by Roque, the following transpired:

BY MISS SCHWARTZ (Government counsel):

"Q: So that when you called him back you did not want to find out what it was about, you already knew what it was about, did you not? Didn't you know what it was all about?

A: No, we had no previous discussions to that.

Q: That was not the question. Did you not know what he was calling you about?

A: I knew he wanted to talk with me.

THE COURT: Did you think it was about ice—"

Q: About girl friends or about drugs?

THE COURT: Did you think it was about ice cream?"

Although the record does not disclose it, this question by the judge probably got some laughs at the expense of the defend-

ant who was testifying. It is difficult to see what other purpose it had.

Several more instances of the trial judge's interruption of the testimony need to be considered. Defendant Sheldon testified that he first became aware of the impending narcotics transaction two or three days before it occurred. This then ensued:

"THE COURT: Now, you understand the question I am sure.

THE WITNESS: Yes ma'am I do. [As is already apparent the prosecuting attorney was a woman and Sheldon regularly answered her questions saying 'ma'am.']

THE COURT: Don't call me ma'am. The question asked you was whether you have not previously testified within the last three minutes in response to United States attorney's question that you first knew of the deal, and I'm trying to remember your own words, three to two *months* before. Did you not testify to that a few minutes ago? (Emphasis added).

THE WITNESS: If I testified to that, sir, it was not exactly . . .

THE COURT: No, don't wiggle. Answer yes or no. Did you testify to it? Then we will go into any explanation. Did you say that a few minutes ago?

THE WITNESS: If I said that, that is not exactly what I meant.

THE COURT: Well, did you say it is my question."

Obviously that was not what the witness said, since he had said he first knew of it within two or three days, not two or three months. While the use of the words "months" was doubtless an unintentional slip of the tongue by the court, it nevertheless resulted in a rather severe berating of the witness.

Sheldon also was subject to further critical comments by the trial court while he was on the witness stand, as indicated by the following passage:

"Q: When did he call you to go with him to do the deal or to help him with the deal, when was the first time he called

you and said 'I want you to go with me' or 'I have the deal set up' or 'Will you come with me' or 'I need your help' or anything like that.

A: After noon of the alleged deal, possibly 2:00 on.

THE COURT: What do you mean 'alleged deal?'

THE WITNESS: Well—

THE COURT: Are you denying that there was a deal at that time?

THE WITNESS: Well, I had no knowledge at that time that there was a deal being made.

THE COURT: But you were to get a percentage of the deal you said, you just told me a few minutes ago. You are unable to tell us what was that percentage, but you were to get a percentage. Now, you are calling it an alleged deal. What do you mean by 'alleged deal?'

THE WITNESS: Sir, would it be easier if I ran through that day for you and right down to the actual bust?

THE COURT: No, it would be easier for me if you simply answer my question. Be a little less voluble and more responsive to my question.

THE WITNESS: My alleged percentage of the deal—

THE COURT: Now your percentage is alleged.

THE WITNESS: My percentage of the deal—the amount was alleged—

THE COURT: Are you the alleged defendant in the case?

THE WITNESS: The amount that I was to receive was not known to me. The fact that I was to receive something was told to my [sic] in the car the night on the way to do the deal. I had spoken to Mr. Solomon in the afternoon. I would assume it would be from 2:00 on. It was in the afternoon. He told me—he asked me if I would go with him and he just wanted me to go with him to meet Joe that night. I did not know at that time that the deal—

that he had actually given him a sample and that the deal was actually going down.

THE COURT: All right."

Finally, Solomon had depicted himself as a young man who was living well, but who had earlier lived and worked on a family farm. Near the close of his testimony dealing with his hesitation about going forward with the deal with Roque, the court intervened with further questions:

"THE COURT: You found the idea [of selling a pound of cocaine] appealing to you?

THE WITNESS: No, not appealing, I just felt that he seemed to know what he knew and I did not want him to think that I didn't know anything.

THE COURT: Why did you not just tell him 'I'm a poor farmer boy, I don't know nothing about that nohow?' "

This Court, in a case cited by the Government in its brief, *Herman v. United States*, 289 F.2d 362 (5th Cir, 1961) said:

"A trial judge 'should never assume the role of prosecuting attorney and lend the weight of his great influence to the side of the Government,' *Hunter v. United States*, 5th Cir. 1932, 62 F.2d 217, 220. In our system of administering justice the functions of the trial judge and the prosecuting attorney are separate and distinct; they must not be confused. The trial judge has a duty to conduct the trial carefully, patiently, and impartially. He must be above even the appearance of being partial to the prosecution. *Blumberg v. United States* (5th Cir. 1955) 222 F.2d 496, 501; *Zebouni v. United States* (5th Cir. 1955) 226 F.2d 826."

In *United States v. Cisneros* (5th Cir. 1974), 491 F.2d 1068, we quoted extensively from the opinion of Chief Justice Hughes in *Quercia v. United States*, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321, including the following:

This privilege of the judge to comment on the facts has its inherent limitations. His discretion is not arbitrary and uncon-

trolled, but judicial, to be exercised in conformity with the standards governing the judicial office. In commenting upon testimony *he may not assume the role of a witness.* He may analyze and dissect the evidence, but *he may not either distort it or add to it.* His privilege of comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses. The influence of the trial judge on the jury 'is necessarily and properly of great weight' and 'his lightest word or intimation is received with deference, and may prove controlling.' This court has accordingly emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence 'should be so given as not to mislead, and especially that it should not be onesided,' that 'deductions and theories not warranted by the evidence should be studiously avoided.' [Citations omitted] He may not charge the jury 'upon a supposed or conjectural state of facts of which no evidence has been offered.' [Citations omitted]" (Emphasis in original).

We then made the following analysis of the rule in this Circuit:

"Through many variations on the *Quercia* theme sound certain recurrent prohibitions. A trial judge must not appear to be a partisan for the prosecution, or in any way exhibit a prosecutor's zeal. *United States v. Musgrave,* 5 Cir. 1971, 444 F.2d 755, 761; *United States v. Marzano,* 2 Cir. 1945, 149 F.2d 923, 926. Nor may he give testimony, be a partisan witness, or *add* to the evidence adduced by either side. *Blunt v. United States,* 1957, 100 U.S.App.D.C. 266, 244 F.2d 355, 365. Most important, he must in no way trespass on the jury's functions and responsibilities, among the most important of which in terms of this appeal is the right to assess credibility in finding the facts. *United States v. Williams,* 5 Cir. 1971, 447 F.2d 894, 902; *United States v. Dopf, supra,* 434 F.2d [205] at 208; *cf. United States v. Stroble,* 6 Cir. 1970, 431 F.2d 1273, 1278." (Emphasis in original).

Measured against these standards, it seems clear that the judge's interruptions by cross-examination and comment, failed to meet the requirements stated in *Blumberg v. United States* (5th Cir. 1955), 222 F.2d 496, 501 that: "It is certainly true, though, that a judge must not only be impartial and disinterested, but must also appear so." We cannot but conclude that the remarks quoted above must necessarily have been understood by the members of the jury to indicate a belief by the trial judge that the defense was without merit or that the defendants and their witnesses were worthy of scant belief.

## II.  CHARGE ON ENTRAPMENT

The defendants, having admitted to their participation in the sale of somewhat less than a pound of cocaine to the Agent Roque, when supplied by Allman at Brock's apartment, defended on the ground that the importuning of Chick and Roque presented the classical case of entrapment which the Supreme Court has most recently redefined in *Hampton v. United States,* (1976), 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113:

"If the result of the governmental activity is to 'implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission . . .', *Sorrells, supra* [287 U.S. 435] at 442 [53 S.Ct. 210, at 212, 77 L.Ed. 413, at 417], the defendant is protected by the defense of entrapment." 425 U.S. 490, 96 S.Ct. 1650.

The jury had ample evidence before it, undisputed by the Government's informer, that for two and a half weeks, first Sheldon and then Solomon, were solicited repeatedly on a daily basis to enter into a deal to sell cocaine to Chick who was concededly a paid Government informer. When "Joey", as Roque had been named to Sheldon, stepped into the picture after this long period of softening up, he also made it known that he wished to take over where Chick had left off, in other words, to cause Sheldon and subsequently Solomon, to make him a sale. The jury was authorized to believe that the

combined efforts of the undercover walk-in informer, posing as a close friend, and Roque, the Government agent, finally wore down the resistance of both Sheldon and Solomon to engage in a transaction which had been described to them as a source of tremendous sums of money. This Court has held that even though the jury should find that the sale was made for money this did not rule out a defense of entrapment, if otherwise available. *Hamilton v. United States* (5th Cir. 1955), 221 F.2d 611. Here, the Court charged the jury in a manner that would require them to consider only such evidence as had been given about Roque's importunities of the two defendants, prior to their acquiescing in making the sale. It, in effect, charged the jury that if they believed the defendant's testimony to the effect that they had successfully withstood the pressures exerted by the harassment and importunities of Chick, then the entrapment defense depended entirely on their decision whether Roque's conduct itself was sufficient to establish the defense.

In light of the fact that the jury could find that the whole proceeding from the time of Chick's arrival at the home of mutual friends was to cause his old-time friend to engage in drug traffic to the point that he practically drove the latter "up the wall" by his importunities, and that at this stage he was called off by the Government agent who took over and himself initiated several calls to the two defendants which resulted in their being more complacent, it was error for the trial court to charge the jury that it could disregard all of Chick's testimony if they believed that it did not directly produce a sale before Roque took over.

The actual charge complained of, repeated in somewhat different form twice, follows:

"Now, there has been a great deal of testimony in respect to a man named Michael Chick, concededly or admittedly what is known to the trade, if I may say so, as a government informer, and the defendants urge that Michael Chick entrapped them.

Now, ask yourselves, as you review the evidence, were the defendants induced by importunities or misrepresentations on the part of Michael Chick to engage in a wrongdoing in which otherwise they would not have been disposed to engage.

They have testified using the words harassed, harassed, harassed, constant telephone calls, but if I recall the evidence correctly and you will remember I have said to you you use your recollection of the evidence not mine, that the end result of Mr. Chick's telephone calls and harassment, if you accept the defendant's term of harassment, was nothing. Sheldon did not agree, according to his own testimony as I recall it, to engage in this offense because of any importunities or urging by Michael Chick. On the contrary, he said he consistently told Chick 'Get lost, get off my back, I won't have anything to do with it.' Similarly, Solomon has indicated, if I remember his testimony, and again that testimony is solely for your recollection, that he, Solomon, rejected, was irritated, annoyed, and completely rejected the efforts and importunities of Chick.

Now, if you find that to be so, *then your approach to the decision on the defense of entrapment as to each defendant would be much foreshortened because if you find after you review the evidence that whatever telephone calls and whatever language Michael Chick may have used, that that did not induce either of these defendants to engage in this crime, and if you so found, that would just bring it down to the very narrow question of did anything that Agent Roque did induce them to commit a crime,* (emphasis added) which they wouldn't otherwise have been disposed to commit."

This, of course, was instruction to the jury that if the two defendants resisted the importunities carried on for two and a half weeks by the Government informer, operating under the direction of the DEA, but finally acquiesced to importunities made by Agent Roque, the jury could not consider anything connected with the softening-up

process but could look only at the approaches made by Roque to determine whether it was "the result of the governmental activity" which "implant[ed] in the mind of an innocent person the disposition to commit the alleged offense and induce its commission . . .", 425 U.S. 490, 96 S.Ct. 1650.

Here, there was no question but that the activities of Chick were the activities of the Government. It won't do to say that where Chick tried repeatedly and persistently, as the undisputed evidence in this case demonstrates, to cause the defendants to violate the laws against the sale of narcotics and then turned the case over to the federal undercover agent since they did not succumb to Chick's pressure, the jury could not consider this conduct in determining whether it was governmental activity that implanted in these defendants' minds the disposition to commit the offense and induce its commission. By effectively eliminating from the jury's consideration, the effect of Chick's activities on the issue of inducement, the trial court gave a partial directed verdict which is, of course, never legally permissible. The defendants' plea of entrapment was based on their contention that the net effect or the end result of Chick's activities together with those of Roque was to bring about the ultimate transaction. Thus, when the trial court told the jury that if it was clear that the defendant had not succumbed to the blandishments of Chick, "the end result of Mr. Chick's telephone calls and harassment, if you accept the defendant's term of harassment, was nothing," it took this issue away from the jury. As this Court has said in *Brooks v. United States* (5th Cir. 1957), 240 F.2d 905, 906, most recently quoted in *United States v. Musgrave* (5th Cir. 1971), 444 F.2d 755, 762:

> "No fact, not even an undisputed fact, may be determined by the Judge. If the plea of not guilty puts all in the issue, even the most patent truths. In our federal system, the Trial Court may never instruct a verdict either in whole or in part."

*See also Roe v. United States* (5th Cir. 1961), 287 F.2d 435, 440, *cert. denied* 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 29. Moreover, no matter how conclusive the evidence, any such instruction amounts to plain error. *United States v. Ragsdale* (5th Cir. 1971), 438 F.2d 21.

## III. THE COURT'S CHARGE ON INABILITY OF JURY TO FIND GUILT BEYOND A REASONABLE DOUBT

Although the trial court charged the jury to the effect that each defendant was presumed to be innocent until proven guilty beyond a reasonable doubt, the court undertook to charge the jury with respect to its duties in the event it found differently with respect to the two defendants. In this connection, the court said:

> "Now, there both Scott Sheldon and Mitchell Paul Solomon are named as well as Brock and Leaman. Again, do not concern yourselves about Brock and Leaman who are not on trial before you. Concern yourselves only with Sheldon and Solomon. Again, are you persuaded by the evidence beyond a reasonable doubt under that count that Mitchell Paul Solomon is guilty. If he is guilty, find him so. If you have a reasonable doubt of his guilt, then he is to be acquitted. Similarly with Mitchell Paul Solomon, if you have a reasonable doubt of his guilt after the evidence—let me revise that:
>
> With respect to Scott Sheldon and Mitchell Paul Solomon, take the charges against them under that count individually, weigh the evidence against each individually, and ask if either or both of them are guilty beyond a reasonable doubt from your review of the evidence. If they are, find them guilty. If you have a reasonable doubt about one but are convinced of the guilt of the other beyond a reasonable doubt, then you *may* find the one about whom you have a reasonable doubt not guilty and the other one guilty, or if you have no reasonable doubt about the guilt of both, you may find—you should find both guilty." (Emphasis added).

222

Defendants, of course, contend that the charge should have read:

"If you have a reasonable doubt about one but are convinced of the guilt of the other beyond a reasonable doubt, then you *must* find the one about whom you have a reasonable doubt not guilty, etc."

Of course, this contention is right. It is not correct that the jury may exercise any discretion as to whether to find a defendant not guilty if it has a reasonable doubt. This Court has held that similar language, using the word "may" instead of the word "must" in prescribing a jury's duty where it is not convinced of guilt beyond a reasonable doubt is erroneous. *United States v. Minichiello* (5th Cir. 1975), 510 F.2d 576. In that case, the trial court, upon a subsequent request by the jury for further enlightenment, changed the words appropriately and the conviction was affirmed. Here, while we agree that it was error to charge in the manner quoted above, in light of the other reversible errors which require a retrial of the case, we pretermit the question whether this charge which may well have been a slip of the tongue by the trial judge is one which could so easily have been corrected by compliance with Rule 52 F.R.C.P. that the court should not notice it as plain error.

The case is reversed and remanded to the trial court for further consideration not inconsistent with this opinion.

REVERSED AND REMANDED.