**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Pedro CRUZ–VALDEZ, Ruben Martin-
Gonzalez and Manuel Fortunado Ar-
iza-Fuentes, Defendants-Appellants.**

No. 82–5310.

United States Court of Appeals,
Eleventh Circuit.

Oct. 16, 1984.

Rehearing En Banc Granted
Jan. 30, 1985.*

Tjoflat, Circuit Judge, filed dissenting opinion.

* Opinion vacated.

**1548**

McMaster & Forman, P.A., James D. McMaster, Miami, Fla., for Cruz-Valdez.

Linda L. Carroll, Miami, Fla., for Martin-Gonzalez.

Margaret E. Retter, Asst. Federal Public Defender, Robyn J. Hermann, Deputy Federal Public Defender, Miami, Fla., for Ariza-Fuentes.

Stanley Marcus, U.S. Atty., Robert J. Bondi, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellee.

Before TJOFLAT and CLARK, Circuit Judges, and GOLDBERG *, Senior Circuit Judge.

CLARK, Circuit Judge:

Appellants Pedro Cruz-Valdez, Ruben Martin-Gonzalez and Manuel Ariza-Fuentes were charged in a two-count indictment with conspiracy to possess with intent to distribute in excess of 1,000 pounds of mar-

* Honorable Irving L. Goldberg, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

ijuana in violation of 21 U.S.C. § 846 (Count I) and possession with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count II). They were arrested when the U.S. Coast Guard boarded their vessel on October 23, 1981 and discovered its cargo of marijuana. All defendants were subsequently convicted on both counts. Four issues have been raised on appeal. All appellants contend that there was insufficient evidence to support their convictions and that there was an error in the jury instructions regarding reasonable doubt. In addition, Martin-Gonzalez and Cruz-Valdez argue that the government failed to prove jurisdiction and venue and that since their vessel was seized outside territorial waters they were improperly indicted and convicted under 21 U.S.C. §§ 841 and 846.[1]

The appellants were arrested when Coast Guard officers boarded their vessel anchored nine to ten miles west-northwest of Key West. The Coast Guard officers had been patrolling in the Smith Shoals area and noticed the shrimping vessel anchored but not fishing. The officers noted that a name "Miss Tia" was affixed to the stern of the board on a piece of plywood and that it did not display a flag. Petty Officer Politis boarded the vessel to insure compliance with all federal regulations. Once on board, he discovered the appellants and the captain of the boat.[2] When the captain failed to produce the proper documents, Officer Politis searched for the vessel's main beam number and upon opening the cargo hatch discovered the marijuana. Officer Politis noted that the fishing gear of the boat was rusted and appeared unusable. No signs that the vessel had been shrimping were found aboard.

After the appellants were transported to Key West, they were separately interviewed by Mary Martin, an immigration inspector. Martin asked each of the appellants a series of questions including ones about the circumstances of their voyage. Aside from the testimony of the Coast Guard boarding officer and that of a DEA agent who supervised the removal of the marijuana from the boat, the government's case rested upon Martin's testimony about the answers give by the appellants to her question.

### Sufficiency of the Evidence

In challenging the sufficiency of the evidence, the defendants argue that the government only established their presence aboard the 68-foot vessel with marijuana in its cargo hold. Each appellant contends that his admissions regarding his role in the voyage, without further evidence by the government, fails to prove conspiracy or possession with intent to distribute.

In assessing these claims, this court must view the evidence in the light most favorable to the government, taking all inferences in its favor. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942). Our review is limited to determining whether a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. *United States v. Bell*, 678 F.2d 547, 548 (5th Cir. Unit B 1982) (en banc).

*United States v. Alfrey*, 620 F.2d 551, 556 (5th Cir.1980), established that a permissible inference of guilt regarding conspiracy with intent to distribute and possession of marijuana could be inferred from

---

1. The substantive and conspiracy drug statutes charged against the appellants read as follows:
   **§ 841.**
   (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly and intentionally—
   (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;
   **§ 846.**
   Any person who attempts or conspires to commit any offense defined in this subchap-

ter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

2. The captain of the boat is a fugitive from justice. He was not tried with the appellants. No evidence about the captain was introduced at trial.

the length of the voyage, the large quantity of marijuana aboard the ship and the necessarily close relationship between the captain and the crew. Presence aboard a ship during a long voyage would imply that crewmembers knew how the marijuana was taken on and where it was to be delivered. *United States v. Munoz*, 692 F.2d 116, 118 (11th Cir.1982). If there was a large quantity of marijuana, the sheer bulk of the drug and its smell would normally make it impossible for crewmen to be unaware of the ship's cargo. *United States v. Ceballos*, 706 F.2d 1198, 1202 (11th Cir. 1983); *United States v. Stuart-Caballero*, 686 F.2d 890, 893 (11th Cir.1982). Evidence revealing a close relationship between the captain and the crew, often inferable from the length of the voyage and the size of the ship, would make it highly unlikely that the crew was unaware of the purpose behind the voyage. The presence of all three factors would indicate that the individuals found aboard a vessel had knowledge of the cargo and the criminal nature of the voyage.

To support the inference of guilt, courts have found additional facts to confirm that the defendant had knowledge of and participated in drug smuggling. Statements made by the individual himself, *United States v. DeWeese*, 632 F.2d 1267 (5th Cir. 1980), proof that the person was a member of the crew rather than a mere passenger, *United States v. Munoz*, 692 F.2d at 118, and suspicious activity by those aboard the vessel when approached by the Coast Guard, *United States v. Alfrey*, 620 F.2d at 553–56, have added support for the drawing of the inference.

■ Applying the *Alfrey* criteria and searching for additional supporting facts here leads us to conclude that there was sufficient evidence to convict Cruz-Valdez and Martin-Gonzalez. Both men admitted to joining the "Miss Tia" in Florida for the trip to Colombia and having been at sea for fifty days. They described themselves as crewmembers. Although both denied participating in the loading of marijuana, they did tell Inspector Martin that they knew what the cargo was. Cruz-Valdez also informed Martin that he knew that the ultimate destination of the boat was Key West. Martin-Gonzalez and Cruz-Valdez had been at sea for a long time, they knew about the large quantity of marijuana stored in the cargo hold and they necessarily had a close relationship with the captain. What makes the case against them is that they confessed, through their discussion with Inspector Martin, to most of the details that established guilt of the two offenses.

■ The case against Ariza-Fuentes, however, stands in a different posture. Ariza-Fuentes made several statements to Inspector Martin which were exculpatory in nature. Although he described himself as a crewman, Ariza-Fuentes also told the immigration inspector that his normal job was that of a taxi driver and this voyage was his first. Ariza-Fuentes also said that he did not discover what the cargo of the vessel was until they had been at sea for three or four days. He told Martin that he boarded the ship in Los Muchiquitos, Colombia and that he did not know when or where the cargo was loaded.

The government argues that these are false exculpatory statements. The government primarily argues that the condition of the fishing equipment and the fact that there was no evidence of fishing activity would have made it impossible for the appellant to be unaware of the true nature of the ship's voyage. The question of when Ariza-Fuentes knew about the cargo was simply a jury question. The fact that the jury found Ariza-Fuentes guilty indicates that they found his story about being a crewman, while not knowing of the cargo or the destination of the ship, unbelievable. In response, appellant argues that it is just as likely that he joined the ship to go to America as it is that he joined in a drug smuggling conspiracy.

■ In order to prove a criminal conspiracy, the government must present direct or circumstantial evidence of an agreement among the conspirators to commit the offense. There must be proof beyond a rea-

sonable doubt that the conspiracy existed, that the accused knew of it, and that he intended to join or associate himself with it. *United States v. Malatesta*, 590 F.2d 1379, 1381 (5th Cir.1979) (en banc). Ariza-Fuentes joined the ship late in its voyage and told the immigration inspector that the ship left Columbia from the point where he boarded the ship. There was no evidence, therefore, that he knew from the ship's previous course the purpose of the voyage.

The government never offered any evidence to show that Ariza-Fuentes must have known the purpose of the voyage and that the hold contained marijuana. There was no evidence that the presence of the large quantity of marijuana would have been apparent to someone boarding the vessel. Instead, the evidence before the jury was that the hatch to the hold was closed and that there was no odor of marijuana. The government also introduced no evidence about where the cargo was loaded in Colombia which might have indicated that Ariza-Fuentes knew about the marijuana before the ship was well out to sea. The paucity of evidence relating to whether Ariza-Fuentes was on a long voyage and knew about the ship's cargo weakens the case against him. This in turn made it hard for the government to offer evidence concerning the third *Alfrey* factor. The close relationship between the captain and crew can normally be inferred from the length of the voyage and the quantity of marijuana, but Ariza-Fuentes stands apart from the other appellants on precisely these issues. It is also difficult to find additional facts which would show guilt. Although Ariza-Fuentes identified himself as a crewmember, there was no evidence concerning how or why the captain took him on the vessel. While it might be true that Ariza-Fuentes' exculpatory statements were false, the government must do more than argue that his story is unbelievable. Since the case against the appellant rested solely upon the information he provided,[3] the government has not managed to prove more than his presence upon the vessel. Finding the evidence against Ariza-Fuentes insufficient, we reverse his conviction.

### Propriety of Indictments Under §§ 841 and 846

In 1980, Congress enacted 21 U.S.C. §§ 955a–955d [4] to curb possession of drugs

---

3. The only reference to Ariza-Fuentes came in Inspector Martin's testimony (T. at 63–65) and the government's closing argument.

4. The relevant portions of the statute provide:

**955a**

(a) It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States on the high seas, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

(b) It is unlawful for a citizen of the United States on board any vessel to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

(c) It is unlawful for any person on board any vessel within the customs waters of the United States to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

(d) It is unlawful for any person to possess, manufacture, or distribute a controlled substance—

(1) intending that it be unlawfully imported into the United States; or

(2) knowing that it will be unlawfully imported into the United States.

\*    \*    \*    \*    \*    \*

(f) Any person who violates this section shall be tried in the United States district court at the point of entry where the person enters the United States, or in the United States District Court for the District of Columbia.

\*    \*    \*    \*    \*    \*

(h) This section is intended to reach acts of possession, manufacture, or distribution committed outside the territorial jurisdiction of the United States.

**955b.  DEFINITIONS**

As used in this Act

(a) Customs waters means those waters as defined in section 401(j) of the Tariff Act of 1930 (19 U.S.C. 1401(j))

(b) High seas means all waters beyond the territorial seas of the United States and beyond the territorial seas of any foreign nation.

\*    \*    \*    \*    \*    \*

**955c.  OFFENSES AND PUNISHMENT**

Any person who attempts or conspires to commit any offense defined in this Act is punishable by imprisonment or fine or both

on the high seas. 1980 U.S.Code Cong. & Adm.News 2785. The statute was enacted to cure an earlier inadvertent repeal of the statute, 21 U.S.C. § 184(a), which had prohibited possession of drugs aboard American ships on the high seas. *United States v. Riker,* 670 F.2d 987, 988 (11th Cir.1982). Before §§ 955a *et seq.* were passed, the Fifth Circuit extended the reach of § 841 to apply to drug smugglers arrested outside the territorial but inside the customs waters of the United States.[5] *United States v. Baker,* 609 F.2d 134 (5th Cir.1980).[6] Section 955a(c) by its terms prohibits possession with intent to distribute by any person on board any vessel within the customs waters. Since the appellants were arrested in 1981, more than a year after the enactment of this later statute, they could have been indicted under § 955a(c). Martin-Gonzalez and Cruz-Valdez argue that they *should* have been so indicted and the government's use of another statute justifies reversal of their convictions. Appellants, in essence, argue that the passage of § 955 preempted the use of §§ 841 and 846 for smuggling within the customs waters. The government contends that it had discretion to charge under either statute and chose § 841 because there is an enhanced penalty available, fifteen years rather than five, if the quantity of marijuana exceeds one thousand pounds.[7] 21 U.S.C. § 841(b)(6). Since the two statutes proscribe the same conduct and the later one does not expressly repeal the other, the appellants are left with arguing that there has been an implied repeal.

■■■ Repeals by implication are not favored. In the absence of an affirmative showing of an intention to repeal, the only justification for an implied repeal is when the earlier and later statutes are irreconcilable. *Morton v. Mancari,* 417 U.S. 535, 549–50, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290, 300 (1974). A review of the legislative history accompanying § 955 reveals no intention by Congress to make § 955a(c) the sole statute for prosecution within the customs waters or to curb the use of §§ 841 and 846 in those circumstances. If Congress had meant to achieve either of those purposes, it could have done so.[8] Just as there is no affirmative showing of an intention to repeal, there is no showing that the statutes are irreconcilable. Differences in the statutes and their interpretation might lead the government to apply the statutes differently. One statute, § 841, may prescribe an enhanced penalty if a certain condition is met, but both statutes proscribe the same conduct. According to *United States v. Baker,* 609 F.2d at 139, sections 841 and 846 are available for use against the crime of possession with intent to distribute so long as the government can prove that the intended distribution would occur in the United States. Section 955a(c) does not require such a showing and therefore places less of a burden on the government. These differences do not make the statutes irreconcilable. There has been no repeal by implication here.

### Jurisdiction and Venue

■■■ Appellants Cruz-Valdez and Martin-Gonzalez contend that the government failed to prove jurisdiction and venue. Proof of jurisdiction and venue are essential elements of any crime in the sense that the burden is on the government to prove

which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

5. The territorial waters consist of a three-mile limit beyond the United States. The customs waters extend from land to twelve miles out to sea. *See United States v. Baker,* 609 F.2d at 136.

6. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to October 1, 1981.

7. The jury in this case, by special interrogatory, found that the appellants possessed in excess of one thousand pounds. Nevertheless, the appellants did not receive the enhanced penalty.

8. At the time § 955a *et seq.* was enacted, Congress also had the benefit of the reasoning of *United States v. Baker* and could have expressed its disapproval of the court's extension of §§ 841 and 846.

their existence. *United States v. Barnes*, 681 F.2d 717, 723 (11th Cir.1982). In this case the indictment read "on or about October 23, 1981, at a point approximately nine (9) miles West-Northwest of Key West, Monroe County, in the Southern District of Florida, the defendants ..." Appellants claim that the government constructively amended the indictment by proving that the crime occurred on the high seas outside the territorial waters of the United States and the Southern District of Florida. Constructive amendment of an indictment occurs when the evidence presented at trial and the jury instructions so modify the elements of the crime charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment. *United States v. Davis*, 679 F.2d 845, 851 (11th Cir.1982). If proven, such an amendment violates a defendant's right to be tried solely on the allegations returned by the grand jury and requires reversal. *Stirone v. United States*, 361 U.S. 212, 215–218, 80 S.Ct. 270, 272–273, 4 L.Ed.2d 252 (1960).

■ The government did not constructively amend the indictment by proving that the crime occurred, as the indictment claimed, nine miles from Key West. *United States v. Baker* established that so long as it is clear that the intended distribution of the drugs would occur within the territorial United States, jurisdiction can be maintained where the defendants are arrested within the Customs waters. The trial court instructed the jury that they had to find a specific intent to distribute within the United States and the jury made such a finding. Once apprehended defendants were naturally taken to Key West, the closest point in U.S. territory, for formal arrest. Since Key West was used as the reference point for describing the location of the boarding

and arrest, it was also natural to mention that the city was within the Southern District of Florida. The government argues that the mention of the Southern District of Florida is mere surplusage and the proof at trial of where the crime occurred matched that alleged in the indictment. Finding this to be true, we refuse to reverse the convictions of the appellants.

## Jury Instructions

■ Failure to make a timely objection to a jury instruction results in waiver unless the instruction constitutes plain error. Fed.R.Crim.P. 30; *United States v. Thevis*, 665 F.2d 616, 645 (5th Cir. Unit B 1982). The plain error exception will not apply unless the charge is so clearly erroneous that there is the likelihood of a grave miscarriage of justice, *United States v. Varkonyi*, 645 F.2d 453, 459 (5th Cir.1981), or it affects the fairness of the proceeding. *See United States v. Adams*, 634 F.2d 830, 836 (8th Cir.1981). The defendants made no objection at trial to the charge on reasonable doubt.[9] We must therefore examine the instruction to see if the court's use of "should" instead of "must" constitutes plain error. Appellants point to *United States v. Sheldon*, 544 F.2d 213 (5th Cir. 1976), as support for their position that "should" was improper. In *Sheldon*, the court held that the district court should have instructed the jury that it must acquit the defendant if there is reasonable doubt. 544 F.2d at 221–222. What concerned the *Sheldon* court was that the word used by the court, "may," indicated that the jury had discretion about whether to find a defendant guilty if it had reasonable doubt. *Id.* at 222. The word "should," however, implies an obligation on the part of the jury rather than discretion. This is particularly true since in reviewing reasonable doubt

---

9. The jury instruction on reasonable doubt reads as follows:

Ladies and gentlemen, a reasonable doubt exists whenever after careful, impartial consideration of all of the evidence in the case, the jurors do not feel convinced to a moral certainty that a defendant is guilty of the charge.

So, if the jury views the evidence in the case as reasonably permitting either of two conclusions, one of innocence, the other of guilt, the jury should, of course, adopt the conclusion of innocence.

charges, this court must look to the whole instruction rather than isolate a particular part. *United States v. Schaffer*, 600 F.2d 1120, 1123 (5th Cir.1979). The trial judge in this case gave a complete instruction regarding the government's burden of proof. The judge also told the jury that if it had reasonable doubt it "should, of course" adopt the conclusion of innocence. The instruction made it clear to the jury what it was obligated to do if faced with reasonable doubt. We find no plain error in the jury instruction given here.

For the foregoing reasons, the convictions of Cruz-Valdez and Martin-Gonzalez are AFFIRMED and that of Ariza-Fuentes is REVERSED.

TJOFLAT, Circuit Judge, dissenting:

I am compelled to dissent because I am convinced that the majority has directed the acquittal of a drug smuggler who, I submit, is obviously guilty.

Our standard of review is time-honored, yet worthy of repeating. We must view the evidence in a criminal case in the light most favorable to the government, with all reasonable inferences from the evidence drawn in favor of the jury's verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Thomas*, 676 F.2d 531, 535 (11th Cir.1982). Its verdict must be sustained if any reasonable construction of the evidence allowed it to find guilt beyond a reasonable doubt. *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982), *aff'd*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). With this firmly in mind, I suggest that the evidence presented to the jurors authorized them to find guilt beyond a reasonable doubt.

The *Miss Tia* left Florida with a captain and two crew members, sailed to Colombia to pick up 220 bales of marijuana, each weighing approximately forty-five pounds, and returned to the United States. *Miss Tia* was a 68-foot shrimp trawler. The fishing gear was obviously unusable, the booms, winches and tackle being rusted and bent. The hatch covers to the marijuana compartments were neither locked nor latched; they could be lifted easily by hand. The name "Miss Tia" was crudely affixed to the vessel's stern on a piece of plywood. The voyage back to the United States required ten days.

Ariza-Fuentes joined the crew of the *Miss Tia* in Colombia, allegedly after the marijuana was loaded aboard. (Ariza-Fuentes told the Immigration Inspector who interviewed him after his arrest that he had worked as a city taxi driver before joining the *Miss Tia* and had no previous experience with boats, but the jury was entitled to disbelieve this self-serving statement.) From all of this evidence, the jurors were entitled to draw the following inferences, which, I submit, were dictated by "reason and common sense." [1]

First, Ariza-Fuentes knew the purpose and destination of *Miss Tia*'s voyage when he joined the crew; this is something any crewman would determine before signing on for a long voyage. He learned that the other crewmen were from the United States and that the vessel's destination was the United States. Ariza-Fuentes plainly saw that the *Miss Tia* lacked rigging for shrimping and knew that the purpose of the voyage was not fishing. *United States v. Ceballos*, 706 F.2d 1198, 1202 (11th Cir. 1983); *United States v. Bustos-Guzman*, 685 F.2d 1278, 1281 (11th Cir.1982). In sum, the jurors could reasonably have found that Ariza-Fuentes knew, before the voyage began, that the *Miss Tia* was tak-

---

**1.** In this case, as in most criminal cases, the jurors are entitled

> to draw such reasonable inferences from the testimony and exhibits as [they] feel are justified in light of common experience. In other words, [they] may make deductions and reach conclusions which reason and common sense lead [them] to draw from the facts which

have been established by the testimony and evidence in the case.

Fifth Circuit Pattern Jury Instructions § 5 (1978).

While the district court did not give this specific instruction to the jury here, its charge, taken as a whole, communicated the essence thereof.

ing a load of marijuana to the United States.

Second, Ariza-Fuentes, having never previously crewed on the *Miss Tia,* determined her seaworthiness before leaving port on the ten-day ocean voyage. His investigation into *Miss Tia*'s condition was especially thorough because of the vessel's relatively small size (68 feet), general state of disrepair, and the fact that she was riding somewhat lower in the water on account of her five-ton cargo of marijuana. The covers to the hatches leading to the ship's hold were unlatched and the hold was readily accessible. During his examination of the boat, Ariza-Fuentes must have looked into the hold and discovered that it was stuffed with marijuana bales. Although the evidence does not indicate the extent of the odor the load of marijuana emitted, the jury, drawing on common sense, could conclude that it must have been overwhelming, just as it could conclude that the odor of a five-ton cargo of fresh tobacco would be pungent. In fact, the large quantity of marijuana alone authorized the inference that Ariza-Fuentes knew what the boat was carrying. *United States v. Mazyak,* 650 F.2d 788, 791 (5th Cir. Unit B 1981), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982).

Finally, Ariza-Fuentes was congenial with the other crew members and had joined in their enterprise. The three-man crew of a 68-foot boat loaded with marijuana would not have taken on an additional member for their ten-day trip to the Florida Keys without some assurance that he could be trusted. If he was not trustworthy, the three men ran the risk that he would cooperate with the authorities if they got arrested. Furthermore, logic tells us that the new sailor had to be loyal to the illicit venture. Had he not been loyal, the three men who brought the boat from Florida could just as easily have made the return trip without extra help. The jury could infer the close relationship between members of the crew merely from the length of the voyage and the size of the vessel. *Ceballos,* 706 F.2d at 1202; *United States v. Munoz,* 692 F.2d 116, 119 (11th Cir.1982),

*cert. denied,* 459 U.S. 1221, 103 S.Ct. 1229, 75 L.Ed.2d 463 (1983).

We have said,

the probable length of the voyage, the large quantity of marijuana on board, and the necessarily close relationship between the captain and his crew [are] factors from which the jury could reasonably find guilt beyond a reasonable doubt.

*United States v. DeWeese,* 632 F.2d 1267, 1272 (5th Cir.1980), *cert. denied,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 188 (1981). Certainly, these factors were present here.

Our job, in this case, is limited. We are only to determine whether twelve fair-minded jurors had enough evidence to convict; we are not to substitute our judgment for theirs. The majority have done just that, and I must dissent.