UNITED STATES of America, Plaintiff-Appellee,

v.

Duncan Lawrence McKELLAR, Defendant-Appellant.

No. 85–1558.

United States Court of Appeals, Fifth Circuit.

Aug. 22, 1986.

Maria VELASQUEZ, et al., Plaintiffs-Appellants,

v.

The CITY OF ABILENE, TEXAS, et al., Defendants-Appellees.

No. 85–1347.

United States Court of Appeals, Fifth Circuit.

Aug. 22, 1986.

Before WISDOM, REAVLEY, and JOHNSON, Circuit Judges.

Gerald H. Goldstein, San Antonio, Tex., Eugene Xerxes Martin, III, Dallas, Tex., for defendant-appellant.

Jack Curtis Williamson, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before GEE, RANDALL, and DAVIS, Circuit Judges.

GEE, Circuit Judge:

Duncan McKellar was convicted of making false statements to two federally insured lending institutions in connection with the development of projects in the Dallas area known popularly as the "I–30 Condos." McKellar filed a motion for a new trial, based on newly-discovered evidence, alleging that the prosecutor withheld exculpatory information, a *Brady* violation. The district court denied that motion, from which denial McKellar now appeals. We affirm, finding no *Brady* violation because the evidence withheld by the prosecutor was not "material" to McKellar's defense.

*Facts*

During 1982 and 1983 Duncan McKellar participated in certain condominium projects in the Dallas area, obtaining financing through the help of Kitco, a company that was promoting the projects. McKellar submitted a number of personal financial statements to Kitco, which in turn submitted them to Empire Savings and Loan Association of Mesquite, Texas, and to First Savings and Loan of Burkburnett, Texas.

In March 1985, the FBI interviewed McKellar about his participation in the projects. According to the FBI interview report, called a "302," the agents asked McKellar to examine a number of financial documents. Regarding two personal financial statements dating from November and December 1982, McKellar stated that the signatures "appeared" to be his, but denied that he had prepared the documents, stating also that the financial information on them was not correct. When shown a financial statement signed on January 15, 1983, McKellar verified that it was a "true copy" of the statement he had submitted and that the signature was his. The "302" does not mention a financial statement signed on January 10, 1985.

In late March 1985, a multi-count indictment was returned charging McKellar with making false statements to federally insured lending institutions in violation of 18 U.S.C. § 1014 and § 2. During early and mid-April 1985, the FBI interviewed Rick Dale, another participant in the condominium projects. Dale stated that Bob Lueben, an employee of Kitco, told him that he, Lueben, had raised the amounts on McKellar's financial statement to make him appear more financially stable. It was not clear which financial statement Lueben was talking about.

In late April, the district court issued a pre-trial order that, among other things, required the government to release any *Brady* material to the defendant. In early May, defense counsel received, among oth-

er things, a copy of the FBI's "302" report of the March interview with McKellar. The prosecutor did not turn over the "302" from Dale's interview that contained the information about Lueben.

During April and May, the defense counsel and the prosecutor discussed the issue of forged signatures; and the government employed a handwriting expert to examine the signatures on a number of documents. The prosecutor then sought a superseding indictment that eliminated all documents with "disputed" signatures. Financial statements signed on January 10 and January 15 remained the basis of certain counts in the superseding indictment, which was returned in late May.

Shortly before trial, McKellar had a handwriting expert examine the signatures on the January statements at issue. The expert confirmed that the signatures were McKellar's. At no time did McKellar challenge the figures on the January statements. At trial, the FBI agent who had interviewed McKellar testified. Defense counsel questioned him about other documents that McKellar had disputed during the FBI interview, documents not at issue in the trial. At trial, McKellar did not challenge the contents of the January statements. Rather, through various witnesses, he attempted to justify the figures which they gave.

The jury found that one or more items on both of the January statements were false. It also found that McKellar had aided and abetted a daughter and son-in-law in submitting false financial statements in connection with the same condominium projects.

When he learned of Dale's information about Lueben, McKellar moved for a new trial. After several hearings the district court denied his motion, concluding that the government had not violated *Brady* requirements. McKellar appeals the district court's judgment of conviction under 28 U.S.C. § 1291.

### The Law

■ The defendant has a constitutional right to be protected against the prosecutor's suppression of exculpatory evidence. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In order to establish a *Brady* violation, however, the defendant must show that the suppressed information was material to his defense on the issue of guilt or on the issue of punishment. *Id.* The Supreme Court has recently addressed the test for materiality. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defendant, the result of the proceeding would have been different." *United States v. Bagley,* — U.S. —, —, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481, 494 (1985). The Court further explains that a "reasonable probability" is "a probability sufficient to undermine confidence in the outcome" of the trial. *Id.*

■ We are guided also by the Court's instruction that we may consider any adverse effect that the prosecutor's failure to release information might have had on the defendant's preparation and presentation of the case. *Id.* We assess the possibility of such effects in light of the totality of the circumstances. *Id.*

### The Law Applied to this Case

■ McKellar contends that the government violated *Brady* by failing to give him the information obtained from Dale. That information indicated that Lueben, an employee of the investment company with which McKellar had worked, admitted to altering one of McKellar's financial statements. Following the *Bagley* materiality standard, we ask: Had Dale's information been disclosed to McKellar, was there a reasonable probability that the jury would not have convicted McKellar?

We note that Dale's information would have been helpful to McKellar only to the extent that it showed McKellar's financial statements were altered without McKellar's knowledge. Two financial statements are at issue under the superseding indictment. Both bear a "Statement Date" of

January 5, 1983; McKellar signed one on January 10, the other on January 15, 1983.[1] The record shows that McKellar had confirmed in his March interview with the FBI that the January 15 statement was a "true copy" of the one he had submitted. Thus, if someone had raised the amounts of figures reflected on that statement, it was with McKellar's knowledge.

The FBI report of McKellar's interview does not mention the January 10 financial statement. But, the record shows that the figures in issue at trial were the same on both statements, except that the January 15 statement lists "Louisiana Oil Property" valued at $200,000, which is absent from the January 10 statement.[2] McKellar attempts to show that Dale's information was pertinent to the discrepancies between the January 15 and January 10 statements—that is, that Lueben altered the January 10 statement. The record shows, however, that the January 10 statement reflected lower valuations than the January 15 statement. McKellar had already adopted the higher values as his own. We fail to appreciate the logic of McKellar's argument here, when the crux of the charges against McKellar was that he *overstated* his net worth.[3]

McKellar might possibly claim he did not carefully read the January 15 statement before verifying its contents during the FBI interview. A review of the record reveals the difficulty, if not implausibility, of this alternative defense. The FBI "302"

report demonstrates McKellar's knowledge of the figures in the January 1983 statement; in it McKellar discussed in detail, and attempted to justify, those figures.[4] We are confirmed in our initial conclusion that Dale's potential testimony—that Lueben admitted to inflating the figures on one of McKellar's financial statements—did not contain in it a probability sufficient to undermine confidence in the outcome of the trial.

Concerning potential adverse effects on McKellar's preparation for trial, the record reveals that McKellar himself, in his March FBI interview, raised the issue of falsified documents. He denied that he had supplied the figures on some, while adopting as his own the figures on the January statement. McKellar's attorney not only had access to his client, but two months before trial he received a copy of the FBI report of McKellar's interview. That report revealed his client's position and recounted McKellar's statement that he dealt exclusively with Kitco, mentioning Lueben by name. Defense counsel pursued the issue of "forged" documents with the prosecutor, which resulted in a superseding indictment that eliminated the documents with disputed signatures. Defense counsel proceeded to trial, never challenging the genuineness of the contents of the January statements. Thus, defense counsel had ample notice of this potential issue and

---

1. Counts 1 and 3 were based on the January 10 financial statement; Counts 5, 7 and 11 were based on the January 15 statement.

2. All counts relating to the January 10 and January 15 statements charge that defendant falsely stated and represented "that his annual income was $300,000, that he owned a farm and horses valued at $600,000, and he intentionally failed to disclose an indebtedness of $380,000. The counts based on the January 15 statements add the oil property valued at $200,000. The jury found McKellar guilty on all counts. Therefore, concerning those counts based on the January financial statements, the jury necessarily found that McKellar falsely represented one or more of these figures.

3. Similarly, we find no merit in McKellar's contention that he did not testify because he could

not explain the discrepancies between the two statements. McKellar contends that, had he known that Dale was a source of corroborating testimony to explain the discrepancies, he would have testified. We first question whether the discrepancies were at all significant. Furthermore, because McKellar had already confirmed higher figures on the January 15 statement as his own, on cross-examination, he faced this hazard, among numerous others.

4. McKellar's detailed discussion included each of the items later specified in the indictment, including salary, his omission of certain indebtedness, and the valuation of the oil property. He also claimed an ownership interest in certain horses.

knew where to begin development of the issue if he wished to pursue it.[5]

Viewing the totality of the circumstances, our confidence in the outcome of the trial is most surely not undermined. Dale's information, had it been released to McKellar, did not give rise to a reasonable probability that the result at trial would have been different. We conclude that Dale's information was not material to McKellar's defense.

Accordingly, we AFFIRM the judgment of conviction.

---

**5.** Likewise, we find no merit in McKellar's suggestion that the trial court discouraged defense counsel from seeking relevant testimony during trial on the manner in which the financial statements were prepared.

In a Motion in Limine, the government requested that no evidence be introduced on whether or not the banks relied on the false statements. The trial court *agreed to hear some*

*evidence,* warning only that he would admonish the jury that "intent is the issue," not whether the banks were actually defrauded. Given the availability of limiting instructions, we fail to see how this ruling thwarted McKellar's attorney from pursuing at trial a relevant line of inquiry designed to show that someone else had altered McKellar's statements without his knowledge.