**George Guy DERDEN, III, Petitioner–Appellant,**

v.

**Sheriff Sammie McNEEL and Attorney General—State of Mississippi, Respondents–Appellees.**

No. 90–1230.

United States Court of Appeals, Fifth Circuit.

Aug. 16, 1991.

Rehearing and Rehearing En Banc Denied Sept. 13, 1991.

---

Leslie Joyner Bobo, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, Miss. (Court-appointed), for petitioner-appellant.

Charlene R. Pierce, Sp. Asst. Atty. Gen., Marvin L. White, Asst. Atty. Gen., and Mike Moore, Atty. Gen., Jackson, Miss., for respondents-appellees.

Before REYNALDO G. GARZA, POLITZ and JONES, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

After exhaustion in the state courts, petitioner appealed for habeas relief to the federal courts. The magistrate recommended relief in his findings and recommendations. The district judge, however, denied relief. We reverse the judgment of the district court and grant the writ. The State of Mississippi is given ninety days in which to retry petitioner or set him free.

## PRIOR PROCEEDINGS

This cause comes before us on the petition of George Guy Derden, III for a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was tried and convicted of burglary in the Circuit Court of Clay County, Mississippi and was sentenced to a term of seven years. 522 So.2d 752. Petitioner is presently incarcerated at the Mississippi State Penitentiary at Parchman, Mississippi.

Derden filed the present action pursuant to 28 U.S.C. § 2254 alleging as error: (1) that he was denied a fair tribunal; (2) that a directed verdict should have been entered or alternatively, that the verdict was against the overwhelming weight of the evidence; (3) that the sentence imposed was excessive; (4) that the State withheld evidence; and (5) that he was denied effective assistance of counsel.

On February 16, 1990, a United States Magistrate recommended that the petition for writ of habeas corpus be granted. On March 19, 1990, a United States District Judge adopted the Magistrate's Report and Recommendation in part and overruled the recommendation in part. Habeas relief was denied. Derden now appeals from the district court order.

## THE FACTS

The burglary at issue occurred on February 10, 1983. The State's evidence consisted of the testimony of three persons who admitted taking part in the burglary, Willie Sherrod, Jay Posey and Tommy Turner. Sherrod had committed probably nine or ten armed robberies but was promised that

he would receive a ten year sentence on all of the charges. Turner was promised a suspended sentence. Posey was promised a non-adjudication of guilt.

Each confessed burglar testified the burglary had been planned by Ricky Forrestor, who was not charged. Posey and Turner testified that Sherrod and Derden, without prior notice, arrived at Turner's apartment in West Point on February 9, 1986, in Derden's van. Sherrod entered the apartment and told Posey and Turner "it was time." Posey and Turner admitted they had not gotten a good look at the person driving the van (allegedly Derden), nor had they exchanged more than a few words with him.

The three burglars testified Derden, Derden's girlfriend, Pam Smith, Sherrod, Posey, and Turner drove to Pheba, Mississippi, and broke into Wade's Grocery and removed a safe. As they were in the process of carrying the safe to the van, they were frightened off by an approaching vehicle. Turner, Derden and Smith allegedly left and drove to Houston (Mississippi) in the van, leaving Posey and Sherrod stranded. Posey and Sherrod then walked to a nearby farmhouse and caught a ride back to West Point.

The burglars testified the burglary had occurred between 12:00 a.m. and 1:00 a.m. Turner testified that following the burglary, he, Derden, and Smith drove the van back to Houston, taking back roads, and then drove the van from Houston back to West Point, where Derden let Turner off. Turner testified, as did the other burglars, he arrived back at his apartment in West Point before Posey and Sherrod.

The State also called two witnesses who had chased the burglars away from Wade's Grocery. Steve McKee and Jerry Thompson testified they interrupted the burglary and had chased burglars from the scene. They were unable to catch them and the last time McKee and Thompson saw the burglars, they were "headed toward Starkville." These young men called the deputy sheriff at 1:00 a.m. on the morning of the burglary to report it.

Neal Blansett and his son, David Blansett, testified they were the farmers whom Posey and Sherrod had approached requesting a ride. They both testified Sherrod and Posey arrived at their home about 1:30 a.m. According to David Blansett, he, Posey and Sherrod arrived back in West Point at approximately 2:00 a.m. Blansett knew this time was correct because he had looked at the clock when he arrived back at Pheba and it was about 2:30 a.m. The trip from West Point to Pheba takes about thirty minutes driving time.

In order to check Turner's testimony, Sheriff McNeel attempted to have Turner duplicate the route from the scene of the burglary through Houston and back to West Point. According to McNeel, the route would take a driving time of two hours and twenty-four minutes. He added fifty minutes of non-driving time based upon Turner's testimony they had stopped Derden's van for that length of time to fill up with gas and to fix a defective tail light. Sheriff McNeel calculated the total time consumed in going from the burglary scene to Houston and back to West Point at three hours and fourteen minutes. Sheriff McNeel further testified each of the burglars told him that Posey and Sherrod arrived back at West Point at approximately 2:00 a.m. and that Turner was back in West Point before they were.

Derden contends the testimony of the State's witnesses is inconsistent. All of the testimony established the burglary occurred at approximately 12:30 a.m. According to the investigation conducted by Sheriff McNeel, however, it would have taken at least three hours and fourteen minutes to make the trip from the burglary scene to Houston and back to West Point. In spite of this fact, each of the three burglars told Sheriff McNeel that Turner had arrived back in West Point before Posey and Sherrod, who arrived around 2:00 a.m.

In his defense, Derden testified on the date of the burglary, Sherrod, an employee at Derden's carpet store, approached Derden about borrowing his van. Derden agreed to meet Sherrod in West Point at

the Apollo Club to swap vehicles with him. The swap was made at the Apollo Club and Derden and Smith travelled in Sherrod's car to Houston to measure homes for carpet installation. Derden asked a policeman for directions in Houston and then purchased gas for Sherrod's car. Derden produced the gas ticket where the gas had been purchased but could not recall the location of the houses he measured for carpet. The policeman recalled having seen Derden's face but could not recall where.

Derden called three witnesses to corroborate his testimony that Sherrod had borrowed his van on the date of the burglary. Pam Smith (Derden's girlfriend) testified she had been with Derden when Sherrod asked to borrow the van, had been present when Derden swapped vehicles with Sherrod and had gone with Derden to Houston to measure homes on the night in question. Tim Smith and Heath Russ both testified they were present and heard Sherrod ask Derden if he could borrow the van on the night of the burglary.

The jury found Derden guilty of the burglary and the judge sentenced him to seven years. Sherrod, Posey and Forrestor were not indicted for burglary and Turner received a five-year suspended sentence with five-years probation.

## OUR STANDARD OF REVIEW

■ Federal courts review habeas petitions for a "constitutional infraction of the defendant's due process rights which would render the trial as a whole fundamentally unfair." *Lavernia v. Lynaugh*, 845 F.2d 493, 496 (5th Cir.1988) (citation and quotation omitted). "The test applied to determine whether a trial error makes a trial fundamentally unfair is whether there is a reasonable probability that the verdict might have been different had the trial been properly conducted." *Kirkpatrick v. Blackburn*, 777 F.2d 272, 278–79 (5th Cir. 1985), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986).

## TO CUMULATE OR NOT–THE ERRORS IN A HABEAS CASE?

■ Although some would say we are playing Captain Cook [1] by sailing uncharted waters with the use of a cumulative error analysis in a habeas case, we disagree. The United States Constitution sets a floor which the state may not go below. Consequently, the inquiry is whether this line was crossed. Our circuit has never before recognized cumulative error analysis in the habeas context. We have, however, recognized cumulative error analysis in a direct appeal. *See United States v. Birdsell*, 775 F.2d 645, 654 (5th Cir.1985), *cert. denied*, 476 U.S. 1119, 106 S.Ct. 1979, 90 L.Ed.2d 662 (1986); *United States v. Webster*, 750 F.2d 307, 336 (5th Cir.1984), *cert. denied*, *sub nom. Buhajla v. United States*, 471 U.S. 1106, 105 S.Ct. 2340, 2341, 85 L.Ed.2d 855, 856 (1985); *United States v. Canales*, 744 F.2d 413, 430–31 (5th Cir.1984); *United States v. Cochran*, 697 F.2d 600, 608 (5th Cir.1983). We now recognize cumulative error analysis in a habeas case.

Nothing in our previous cases precludes us from taking this route. *Mullen v. Blackburn*, 808 F.2d 1143 (5th Cir.1987), did not reject a cumulative error analysis in a habeas corpus proceeding. That case merely stated all of petitioner-Mullen's claims were meritless. *Id.* at 1147. Therefore, he had nothing to cumulate. This is not the situation in the case at bar.

How do we perform a cumulative error analysis in a habeas appeal? There is no set formula and each case must be independently examined. The sole dilemma for the reviewing court is whether the trial taken as a whole is fundamentally unfair. *Lavernia v. Lynaugh*, 845 F.2d 493, 496 (5th Cir.1988). When a trial is fundamentally unfair, "there is a reasonable probability that the verdict might have been different had the trial been properly conducted." *Kirkpatrick v. Blackburn*, 777 F.2d 272,

1. Captain Cook was the great English explorer who sailed the South Pacific charting such islands as Tahiti and Fiji.

278–79 (5th Cir.1985), *cert. denied,* 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986).

■ Why do we perform a cumulative error analysis in a habeas appeal? This is a Fourteenth Amendment Due Process inquiry and the fact whether one or several trial errors caused the trial to be fundamentally unfair is not important. It has been the law for some time that one error in a trial can violate a petitioner's Fourteenth Amendment right to due process. *See, e.g., Cooper v. Wainwright,* 807 F.2d 881, 888–89 (11th Cir.1986) (exclusion at sentencing hearing of proffered mitigating evidence cognizable as due process violation when the evidence is probative and the exclusion prejudicial); *Thigpen v. Cory,* 804 F.2d 893, 895–98 (6th Cir.1986) (admission of eyewitness testimony cognizable as due process violation when the eyewitness had three unduly suggestive pre-identification encounters with petitioner and strong evidence supported petitioner's alibi), *cert. denied,* 482 U.S. 918, 107 S.Ct. 3196, 96 L.Ed.2d 683 (1987); *Thomas v. Leeke,* 725 F.2d 246, 250–52 (4th Cir.) (confusing and contradictory jury instructions regarding petitioner's burden of proof on self-defense claim constitutes due process violation), *cert. denied,* 469 U.S. 870, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984); *Osborne v. Wainwright,* 720 F.2d 1237, 1238–39 (11th Cir. 1983) (admission of allegedly gruesome and unduly prejudicial photographs cognizable as due process violation when the evidence adduced at trial is extremely close on the question of petitioner's guilt).

Several errors taken together can also violate a petitioner's right to due process and cause the trial to be fundamentally unfair. *See Lundy v. Campbell,* 888 F.2d 467, 481 (6th Cir.1989) (cumulatively analyzing "the constitutional significance of the trial errors"), *cert. denied,* — U.S. —, 110 S.Ct. 2212, 109 L.Ed.2d 538 (1990); *Walker v. Engle,* 703 F.2d 959, 963 (6th Cir.) ("Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." The petitioner in

*Walker* was granted the writ on a cumulative error analysis. (emphasis ours)), *cert. denied,* 464 U.S. 951, 104 S.Ct. 367, 78 L.Ed.2d 327 (1983); *United States ex rel. Cannon v. Maroney,* 373 F.2d 908, 910 (3d Cir.1967) ("[E]rrors committed during the trial of a criminal case in state court are not subject to review in a habeas corpus proceeding in a federal court unless it is shown that the errors were so conspicuously prejudicial as to deprive the defendant of a fair trial." (emphasis ours)); *Conner v. Deramus,* 374 F.Supp. 504, 516 (M.D.Pa. 1974) ("[I]t is well settled that errors committed during the trial of a criminal case in state court are not subject to review in federal court unless it is shown that the cumulative effect of the alleged errors were so conspicuously prejudicial as to deprive the defendant of a fair trial." (emphasis ours)); *Bowers v. Coiner,* 309 F.Supp. 1064, 1071 (S.D.W.Va.1970) (If the cumulative effect of trial errors "is of such magnitude as to offend a sense of justice, due process is denied." (citation and quotation omitted)). Hence, we are not inventing new law. We are only applying that which was secured to the accused over two-hundred years ago.

The state, quoting *Mullen,* contends that adopting a cumulative error analysis in the habeas context would have the effect of soliciting collateral appeals. This is ridiculous. We are merely providing that which The Constitution requires. It will be the highly exceptional case which warrants relief on a cumulative error analysis. The fundamentally unfair trial which violates due process is rare, but when it does occur this analysis should be available to petitioners.

## WAS THIS TRIAL FUNDAMENTALLY UNFAIR?

It is important to keep in mind that in a cumulative error analysis no single error is ground enough to grant the writ. There must be a cumulation of errors which results in a deprivation of due process. Consequently, we analyze the entire proceed-

ing.[2]

### The conduct of the trial judge

██ The conduct of the trial judge encouraged a predisposition of guilt by the jury because the judge improperly confused the functions of the judge and prosecutor. *United States v. Davis*, 752 F.2d 963, 974 (5th Cir.1985). Throughout the trial the judge admonished defense counsel. The judge told the jury that one of defense counsel's points didn't make any difference, that he didn't care for defense counsel's "side remarks," that defense counsel was argumentative and repetitious, that he didn't care whether the state's witnesses compared notes during a recess, that defendant's evidence was immaterial and irrelevant and that he wasn't paying any attention to defense counsel's closing statement and didn't know what had been said. This intervention was uncalled for and tended to lead the jury to believe that Derden and his counsel were not to be believed. *See United States v. Sheldon*, 544 F.2d 213, 219 (5th Cir.1976) ("We cannot but conclude that the remarks quoted above must necessarily have been understood by the members of the jury to indicate a belief by the trial judge that the defense was without merit or that the defendants and their witnesses were worthy of scant belief.").

On separate occasions, the prosecutor objected to defense counsel's opening statement contending he was arguing his case. The objection was sustained each time and defense counsel was instructed to refrain from arguing his case. A key defense theory was that the State's witnesses could not possibly be telling the truth because it was physically impossible for burglar Turner to have travelled with Derden to Houston and still arrive in West Point before burglars Posey and Sherrod returned. A somewhat detailed opening statement was needed to explain this to the jury. Further, in response to one of the prosecutor's objections, the trial judge chastised defense counsel.

MR. ALLGOOD:

If your Honor please, might I get the Court to instruct counsel not to argue his case at this point in this trial.

THE COURT:

I have instructed him that, Counselor, and this is the last instruction I'm going to give him.

On several occasions, defense counsel was rebuked in the absence of any objection by the prosecution. During the cross-examination of burglar Sherrod, the following exchange took place.

Q. You told him you were on parole and you couldn't get work, didn't you?

A. Yeah.

Q. He felt sorry for you and gave you a job, is that true?

THE COURT:

Just a minute, Counselor. I don't think this witness would know whether he felt sorry for him or not. Just ask him if he gave him a job.

\*   \*   \*   \*   \*   \*

MR. WAIDE:

I move the court to permit me to re-cross briefly based on what he [the prosecutor] went into.

THE COURT:

Solely on that point, Counselor.

MR. WAIDE:

Whether he's had opportunity to talk with these gentlemen?

THE COURT:

I don't know about opportunity. You can cross examine him about when he talked to them. He said he talk—he hadn't talked to them. You can cross examine him on that.

MR. WAIDE:

Well I'd like to show he's had the opportunity if I might, your Honor.

THE COURT:

Counsel, what difference does it make if he had an opportunity to talk every day if he didn't talk. Cross examine him on the times he did talk to them.

---

**2.** Deference is given to the factual determinations of the trial court unless the federal court finds one of the eight exceptions listed in 28

U.S.C. § 2254(d) applies. *Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983).

During the cross examination of Jay Posey, the following conversation took place:

Q. But you told him [your lawyer] you didn't want to talk to me, didn't you?

A. I asked him if—did—did I need to talk to you, did I have to talk to you; he said no I did not, and I did not.

Q. I didn't have anything I could offer you, did I, Mr. Posey.

MR. ALLGOOD:

If your Honor please, I'm going to ask the Court to allow the witness to finish completing his answer before counsel asks him another one.

THE COURT:

Let him complete his answer, Counsel, and I don't care about these little side remarks. Just ask questions.

At the close of the examination of Posey, the prosecutor informed the judge the examination of the next witness would be lengthy. He asked the judge whether he wanted to recess for lunch or take the witness before the lunch recess. At that time, the following exchange took place:

MR. WAIDE:

Your Honor, I would move the Court to go on; it's important to see—let the jury see them [the State's witnesses] and not have an opportunity to talk to one another during the noon recess. I'd move the Court to go on.

THE COURT:

They don't talk to one another during the noon recess, Counselor.

MR. WAIDE:

Your Honor, they're in the same witness room.

THE COURT:

I'm talking about the jury.

MR. WAIDE:

I'm talking about the witnesses, your Honor. It's important for us to have—

MR. ALLGOOD:

If your Honor please—

MR. WAIDE:

—have them taken—

THE COURT:

I don't care about any of that. the only thing I'm concerned about is con-serving time. Go ahead and call your witness.

Immediately before the direct examination of Oleta Matthews, the following took place:

MR. WAIDE:

I have one other brief—very brief witness, your Honor.

THE COURT:

All right, if it's not brief, I'm going to make it brief.

Finally, during defense counsel's closing argument, the court made the remark following an objection by the prosecution that "I just wasn't paying any attention; I don't know what was said, Counsel, but you may proceed." All of the dialogue recited above did not itself deprive petitioner of due process but adversely reflected upon the defendant and his counsel.

The trial judge did not stop with defense counsel, however. He admonished and reprimanded Derden several times. Each time lowering the jury's impression of the defendant. The jury essentially weighed the testimony of Derden against the testimony of the State's witness. It is important to remember that each witness for the State had struck a deal in exchange for testimony. The following is illustrative of the treatment by the trial judge of petitioner:

Q. Assuming Turner was telling the truth, and that van was—had gone from West Point over to Pheba after you'd filled up in Columbus and made a slight detour toward Starkville, and then gone up to Houston in your opinion would that van have needed any gas in it in Houston?

A. That van could have gone to Memphis, Tennessee, without needing any gas.

MR. WAIDE:

Tender that last document into evidence, your Honor.

THE COURT:

It will not be received into evidence. Let me caution the witness. Mr. Derden, I don't care if it had gone to Memphis or Chicago and the jury don't either; just answer his question, do you understand?

A. Yes, sir.

Although seemingly unimportant, this testimony was critical. Under all the testimony, Derden had gone to Houston on the night in question. The crucial inquiry was whether Derden went in Sherrod's car, as Derden testified, or whether he went in the van which had been used in the burglary, as Turner testified. The vehicle that went to Houston was filled with gas at the Pak–a–Pok on the night of the burglary. The receipt showing this was introduced into evidence. Derden wanted to discredit Turner's testimony that the van used in the burglary had gassed up in Houston by introducing the receipt showing that he had filled the van with gas earlier that day and it would not have needed gas in Houston. This is important because the trial judge's comment seemed to indicate he did not care whether the van would have needed any gas in Houston.

The following are other examples of the trial judge's comments to Derden:

Q. Do you have any invoices or business records showing where you were when you installed the carpet the next day?

A. Yes, sir, I do.

Q. Do—could you produce those for me?

MR. ALLGOOD:

If your Honor please, I—I'm going to object to those on the same basis; these were not provided to us in discovery; it's the first time I've ever heard of any such receipts.

MR. WAIDE:

Actually—

MR. ALLGOOD:

I don't think they have any relevancy whatsoever—

THE COURT:

Let him get through, Counselor.

MR. ALLGOOD:

—Any relevancy whatsoever, and I'm going to object to them on that basis.

MR. WAIDE:

Your Honor, that's absolutely false, and I'll produce the records where I kept asking them to go over and look at George's records in the jail and he never would go, and I have the letters I've sent to him asking him to look at them.

MR. ALLGOOD:

If your Honor please—

THE COURT:

Counsel, he's testified where he was. Now I don't know what you're trying to do with the records. If you've got witnesses here that made these records and can properly validate them and the people he worked for here to testify that he was there that day, then I'll let them in; otherwise, I am not going to let these records in. He can testify where he was and what he did.

MR. DERDEN:

Sir, can I make a statement?

THE COURT:

No. Your lawyer can adequately represent you.

\* \* \* \* \* \*

Q. Mr. Derden, how long did it take you to measure that house up yonder in Houston?

A. I measured two houses. I would—I would say I was at the first house approximately maybe an hour, and then I was at the second house like I said I talked to the people because the man was interested in selling some carpet in the Houston area he indicated.

THE COURT:

Just a minute. Witness, he asked you a simple question, how long did it take you to measure the houses. He didn't ask you who you talked to or what the conversation was. Just answer the question, how long did it take you to measure the two houses.

\* \* \* \* \* \*

Q. The ticket or the receipt for the check for the gasoline up in Houston, is that correct?

A. If I can get—that sir, I got it laying right over there; would you like for me to get it for you?.

Q. You took that over there to Mr. Graham's office, is that correct, Mr. Derden?

A. Can I get that for you, sir?

Q. I'm asking you a question, Mr. Derden.

A. Yes, sir, I—

THE COURT:

Mr. Derden, you answer the questions; you don't ask questions.

\* \* \* \* \* \*

Q. I'm sure it is. You unloaded that material there in Columbus, is that correct?

A. At the carpet store in Columbus, yes, sir.

Q. And the amount was a van load full, is that correct?

A. (Witness looks through records) There was nineteen rolls; one of them was two hundred and forty-eight feet and nine inches long. Oh, I'm sorry, that's the accumulated total.

THE COURT:

Mr. Derden, can't you just answer whether or not it was a van load full or half full or a quarter full.

A. It was—it was a van load full, sir. I had nineteen rolls.

THE COURT:

All right, that's what he asked you.

These remarks pale, however, in comparison to what the judge addressed to petitioner during his cross-examination. In response to a question by the prosecutor Derden responded "Well I've been in jail, ladies and gentlemen, since January twenty, eighty—eighty-five—." To which the court declared *"Just a minute. Face the lawyer and answer the lawyer's questions, and you do not address the jury, you understand? I'm not going to caution you about this again."* Such a remark was inexcusable and could leave no other impression with the jury that Derden was guilty. Shortly after this remark, still during cross-examination of Derden by defense counsel, Derden asked the judge "Could I not answer that question he asked me, sir, if I know the answer to it?" To which the judge snapped back *"When you answer a question answer yes or no, you understand? If it needs an explanation I'll let you explain your reason, but first answer yes or no."*

At sentencing, the trial judge attempted to explain his contempt for Derden by explaining "I have compassion for an uneducated person that does not have a job that might commit burglary to get food for his family; I have no compassion for somebody with an education such as yours and a previous felony conviction." Such comments do not validate the treatment given petitioner.

▉ The conduct of the trial judge in this case violated the standard set forth by our circuit. This judge did not exhibit neutrality in conducting the trial and his conduct left the impression Derden was a guilty man. *United States v. Candelaria–Gonzalez,* 547 F.2d 291, 297 (5th Cir.1977). As the magistrate found, there was a "hostile atmosphere created by the trial judge's remarks and attitudes." The instruction given by the judge to the jury at the end of the trial did not dissolve the cloud cast over the trial either. This ruling merely concerned the evidence. "You must not concern yourself with the reasons for the Court's rulings since they are controlled and governed by rules of law. You should not infer, however, from any of the Court's *rulings* that the Court has any opinion on the merits of the case favoring one side or the other." (emphasis ours) From our view of the proceeding, even if the instruction had concerned the comments and reprimands made by the judge, "some comments or remarks are so prejudicial that even the strongest instructions to the jury to disregard the judge's questions or comments will not suffice." *United States v. Carpenter,* 776 F.2d 1291, 1296 (5th Cir. 1985). Moreover, many of the remarks were directed at the defendant, Derden. "When a defendant takes the stand in his own behalf, any unnecessary comments by the court are too likely to have a detrimental effect on the jury's ability to decide the case impartially.... This is especially true where the judge's remarks are directed to the defendant." *United States v. Middlebrooks,* 618 F.2d 273, 277 (5th Cir.), *cert. denied,* 449 U.S. 984, 101 S.Ct. 401, 66 L.Ed.2d 246 (1980). The actions of the trial

judge substantially contributed to petitioner's deprivation of due process.

### The prosecutorial misconduct

■ The conduct of the prosecutor during the trial also contributed to a denial of due process. The prosecutor's conduct amounts to a denial of due process when his comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quotation and citation omitted). The conduct must be "either persistent and pronounced or ... the evidence so insubstantial that [in probability] but for the remarks no conviction would have occurred." *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir.1985) (quotation and citation omitted), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986).

During voir dire, the prosecutor sought commitments that the jurors would believe the testimony of the admitted burglars. The prosecutor, Mr. Allgood, told the jurors three people were going to testify for the State and all three had cut "deals" with the State in order for them to testify. The following then took place:

MR. ALLGOOD:

Now my questions to you in this regard is simply this: First of all, do any of you feel that such testimony, such arrangements, if you will, are inherently untruthful, would inherently cause the witness not to tell the truth?

MR. WAIDE;

Your Honor, if the Court, please, I object to that; that's a question for the jury to determine as to whether it would. I don't think he's—this is the proper time to be arguing about that.

MR. ALLGOOD:

I'm not arguing, your Honor, I'm asking a question.

THE COURT:

All right, just ask questions.

MR. ALLGOOD:

Thank you, your Honor.

THE COURT:

Don't argue your case.

MR. ALLGOOD:

Do any of you feel that such testimony from such witnesses is inherently untruthful? (No response)

MR. ALLGOOD:

If you have any reservations about that, now would be the time to raise your hand.

MR. WAIDE:

Your Honor, if the Court please, for the record I do object to that. I think it's an improper question, incorrect according to law.

THE COURT:

All right, the record will reflect your objection. You may proceed. I believe they've answered the question Counselor

MR. ALLGOOD:

Thank you your Honor.

Now would anybody—anybody simply disregard the testimony of those witnesses simply because of a plea bargain arrangement with them?

MR. WAIDE:

If the Court please, I object to that now; the jury may entirely disregard it if they find from the evidence it should be disregarded, and that's an improper question.

THE COURT:

The Court will instruct them on that, Counselor, at the proper time.

MR. ALLGOOD:

Would anybody simply disregard their testimony simply because of that plea bargain arrangement? (No response)

MR. ALLGOOD:

All right, second, on this point: would any of you automatically disbelieve it just because it was made in this context? (No response)

MR. ALLGOOD:

Okay, there is—basically what I'm trying to get to and I—and—and as I understand it, you are all telling me that you will weigh their testimony as you would anybody else's. If anybody says that they cannot do that, that they could not weigh their testimony as they would any-

body else's would you please indicate it now by raising you hand?

MR. WAIDE:

Your Honor, to which I object because they're not entitled as a matter of law to have their testimony weighed as anybody else's. That's an incorrect statement of the law.

THE COURT:

The court will properly instruct them on the—

MR. ALLGOOD:

Thank you, your Honor.

THE COURT:

—Believability or credibility of witnesses at the proper time. Let's move on.

MR. ALLGOOD:

Thank you, your Honor.

Is that—if any of you have any problem with that statement that you would weigh their testimony as you would anybody else's, would you please raise your hand? (No response)

■ As illustrated above, the prosecutor was permitted to obtain promises from the jurors that they did not consider co-conspirator testimony to be "inherently untruthful," that they would not disbelieve the witnesses because of the plea bargain agreements, that they would weigh the co-conspirators testimony just as "anybody else's" and that the jurors saw "no problem" with the co-conspirators' testimony. This line of voir dire was improper under Mississippi law. The uncorroborated testimony of an accomplice must "be viewed with great caution and suspicion and that it must be reasonable and not improbable or self-contradictory or substantially impeached." *Thomas v. State*, 340 So.2d 1, 2 (Miss.1976). It is not to be ignored that at the end of the trial, the trial judge did instruct the jury on this point.[3] The question remains, however, why the judge allowed the prosecutor to pursue improper voir dire. This miniscule instruction at the end of the trial could not possibly have overcome the damage that was done at voir

dire and does not explain why the defense objections were overruled. Consequently, the instruction had little if any bearing on the minds of the jurors in light of what had earlier taken place.

■ The prosecutor, similar to the trial judge, did not limit his improper conduct to one instance, however. During the trial, he managed to improperly bring in evidence of other crimes allegedly committed by petitioner. On cross-examination of co-conspirator Sherrod, defense counsel adduced evidence Sherrod had committed a number of other crimes for which he was not going to be punished to show that Sherrod had a motive for testifying. The prosecutor, however, took advantage of this solicitation of evidence as shown by the following:

MR. ALLGOOD:

Q. Now you—you were charged with a number of—of armed robberies in Lowndes County and a number of robberies in, for that matter, I think in Alabama, is that correct?

A. That's right.

Q. And Mr. Waide cross examined you on those, is that correct?

A. Right.

MR. WAIDE:

Your Honor, if the Court please, I object to this and I'd like to make a record on it probably outside the presence of the jury. It's improper indirect; it's grossly improper as Mr.—Mr. Allgood knows and I'd like to make a record on this because I think I know what he's fixing to try to do.

THE COURT:

Well I don't and he—you asked him about these robberies; at this time the objection is overruled.

MR. ALLGOOD:

Q. In all of these robberies, Mr. Sherrod, who was involved with you?

A. George Derden.

Q. And—

MR. WAIDE:

---

3. The judge told the jury they were "to regard this testimony [of the co-conspirators] with

great suspicion and consider it with caution."

Your Honor I specifically object on the grounds that now he's trying to prove other crimes that Mr. Derden has not been charged with today, and it's all prejudicial—

THE COURT:

All right, the objection is now sustained, and the jury will be admonished to disregard that remark.

Despite defense counsel's efforts to draw this matter to the court's attention before it happened, by means of an objection or outside the presence of the jury, the prosecutor managed to elicit this improper testimony. Of course, the curative instruction should not be forgotten. The judge did instruct the jury to disregard the testimony. By that time, however, the skunk was already in the jury box and the stench could not be removed. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Moreover, the prosecutor blatantly disregarded the law of Mississippi and introduced evidence of another crime separate from that charged in the indictment and for which the accused is being tried. *See Bolin v. State,* 489 So.2d 1091, 1092 (Miss.1986). The improper conduct alone does not warrant habeas corpus relief but contributed significantly to petitioner's deprivation of due process.

### The weak evidence

■ Three co-conspirators testified for the State as to the events which occurred on the night in question. According to independent testimony, the burglary occurred at approximately 12:30 a.m. and that Posey and Sherrod, the burglars who were left at the scene when the other burglars fled in the vehicle, arrived back in West Point, Mississippi at 2:00 a.m. or 2:05 a.m. According to the testimony of Sheriff McNeel and Turner, the drive from the scene of the crime to West Point, along the route Turner claims he, Derden and Pam Smith took, would have taken over three hours. Consequently, it is difficult to see how the co-conspirators were telling the truth with regards to this. This, in itself, is not a violation of due process but bol-

sters our conclusion that a violation of the Due Process Clause occurred.

### The radio log

The defense made a general request for the prosecution to produce all exculpatory evidence. A radio log which could have been key to the defense was not produced, however. The entries on the Clay County Sheriff's radio log for February 9, 1983 and February 10, 1983 prove the testimony of State's witnesses Hugh Stevenson and Sheriff Sammie McNeel was possibly incorrect. Both Stevenson and McNeel testified, according to the radio log, Stevenson called the Sheriff's Office at 1:00 a.m. in order to run an identification check on a Mississippi license plate. The radio log, however, shows Stevenson did not make the call until 2:05 a.m.

■ In *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963), the Court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." A defendant must prove the following to establish a *Brady* violation: (1) the prosecution suppressed evidence, (2) the suppressed evidence was favorable to the defense and (3) the suppressed evidence was material to the defense. *United States v. Lanford,* 838 F.2d 1351, 1355 (5th Cir. 1988). The test for materiality is whether there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). A reviewing court may consider any adverse effects the prosecutor's failure to release information might have had on the defendant's preparation and presentation of the case. *United States v. McKellar,* 798 F.2d 151, 153 (1986).

■ The radio log was clearly an impeachment device for all of the State's witnesses. Sherrod, Posey and Turner would have been impeached by the log because it

would have discredited their stories of the events which occurred on the night in question. If Stevenson did not make the call until 2:05 a.m., the time frames given by the three co-conspirators would deserve little credence. The crux of the defense was that the events, as described by the State, were chronologically impossible. The log impeaches the testimony of Stevenson and McNeel by contradicting their testimony. Failure to disclose the log was another error contributing to the due process violation.

## ADD IT ALL UP AND WHAT DO YOU GET? A VIOLATION OF DUE PROCESS

At the beginning of trial, we had an entire cloth sheet. As trial progressed and the conduct from the judge and the prosecutor worsened, a tear developed down the middle of the sheet. With each improper remark the tear lengthened until at the end of trial what was one sheet is now two. It takes two sheets to obtain relief in a habeas context. The two sheets are symbolic of a due process violation.

When the conduct of the judge and the prosecutor are examined in light of the testimony adduced at trial, who testified in order to obtain the conviction (people who had cut deals with the State) and the impeachment evidence the defense was denied you have a glaring violation of due process. Such a violation warrants habeas relief.

## CONCLUSION

Accordingly, the judgment of the district court is REVERSED and petitioner's writ of habeas corpus is GRANTED. The State of Mississippi has ninety days in which to retry Derden or set him free.

EDITH H. JONES, Circuit Judge, dissenting:

The Supreme Court has stated firmly that federal courts' habeas corpus responsibility must be exercised with due regard

for the finality of state court judgments. *Coleman v. Thompson,* — U.S. —, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *McCleskey v. Zant,* — U.S. —, 111 S.Ct. 1454, 1468–69, 113 L.Ed.2d 517 (1991). When Derden appealed his conviction for armed robbery to the Mississippi Supreme Court, he contended that fundamental fairness was violated by the cumulative effect of many of the alleged trial errors raised here. With one exception, the State Supreme Court found all of them meritless to the point that they warranted no discussion. *See Derden v. State,* 522 So.2d 752, 755 (Miss.1988). The State Supreme Court did rule that the prosecutor violated Mississippi law in the conduct of *voir dire* on the co-conspirators' testimony, but it held that this error was later cured by the trial court's jury instruction.[1]

To reach its conclusion that "cumulative error" caused a conviction that violates due process, the panel majority have read the record diametrically differently from the State Supreme Court. The majority's scatter-gun cumulation of "error" allows a series of unconnected events in the trial, several of which would not even be considered errors of state, much less constitutional law, to vitiate a jury verdict supported by considerable evidence. I cannot reconcile the majority's freewheeling reading of the record with the restraint that we are to exercise under § 2254, and I must therefore respectfully dissent from their granting of the writ.

But first, I do not necessarily disagree that habeas corpus might be granted for a series of trial court errors, not individually reversible, that so poisoned the state trial court atmosphere as to cause, on the whole record, a questionable guilty verdict. The Supreme Court found such an aggregation of error in *Taylor v. Kentucky,* 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978), where several flaws in the state trial shared the common theme of failing to inform the jury that criminal guilt must be

---

1. *Derden,* 522 So.2d at 754. The trial court agreed to give defense counsel's proffered instruction that, "I charge you that Jay Posey, Willie James Sherrod and Tommy Turner have admitted being accomplices to this burglary. You are to regard this testimony with great suspicion and to consider it with caution."

proved beyond a reasonable doubt. This court also essentially relied on a "cumulative error" theory when it granted the writ to a defendant whose trial was overshadowed by an ambiguous stipulation that prevented him from arguing an insanity defense while the prosecutor repeatedly asserted, contrary to overwhelming medical evidence, that defendant could not have been insane when he murdered his wife and slashed his wrists. *Guidroz v. Lynaugh,* 852 F.2d 832, 837 (5th Cir.1988). *See also Lundy v. Campbell,* 888 F.2d 467, 481 (6th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2212, 109 L.Ed.2d 538 (1990); *Bell v. Duckworth,* 861 F.2d 169, 170 (7th Cir. 1988), *cert. denied,* 489 U.S. 1088, 109 S.Ct. 1552, 103 L.Ed.2d 855 (1989); *Matlock v. Rose,* 731 F.2d 1236, 1242 (6th Cir.1984), *cert. denied,* 470 U.S. 1050, 105 S.Ct. 1747, 84 L.Ed.2d 812 (1985). Our decision in *Mullen v. Blackburn,* 808 F.2d 1143 (5th Cir.1987), does not reach the possibility of cumulative *error* as a basis for habeas relief. *Mullen* merely rejected the theory that "would encourage habeas petitioners to multiply claims ... even if *none of these had any merit.*" *Id.* at 1147 (emphasis added).

These cases, however, highlight obvious limitations necessary to impart some principles to the "cumulative error" theory, so that it does not encourage federal courts simply to overturn convictions they viscerally disagree with. First, the theory refers to *errors* in the trial court. A defendant may not just complain of unfavorable rulings or events in the effort to cumulate errors. *See United States v. Rivera,* 900 F.2d 1462, 1470 (10th Cir.1990) (en banc). Second, a defendant must have objected to the alleged error, not only because of procedural bar, but also because it is too easy, reviewing a cold record, to misinterpret the impact of evidence or comments at trial. *See, e.g., United States v. Canales,* 744 F.2d 413, 431 (5th Cir.1984). The absence of an objection powerfully suggests that

defense counsel did not really find the trial court's or opposing counsel's action offensive. Third, as is typical in habeas review, the court must review the record as a whole to determine whether the errors more likely than not caused a suspect verdict. *Kirkpatrick v. Blackburn,* 777 F.2d 272, 279, 281 (5th Cir.1985), *cert. denied,* 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986). These limitations, while acknowledged by the majority, are nevertheless distorted by their analysis. I hope to demonstrate that there were not so many "errors" with an adverse impact upon Derden that even though none of them would rise to constitutional significance, together they denied him a fundamentally fair trial. Further, this verdict was not so tenuously supported as the majority suggest.

## I. The "Errors"

The fundamental question is whether the jury could have been so powerfully influenced by trial "errors" that their reasoning processes were fatally flawed. The majority point to three sources of "error": comments by the trial court; two instances of prosecutorial misconduct; and a *Brady* violation. I question whether any of these events, apart from the prosecutor's *voir dire* about co-conspirator testimony, amounted to "error" individually or cumulatively.

### A. The Judge

The panel majority devote most of their criticism to the state trial judge's alleged intemperance toward Derden. What each event reflects to me, however, is at best ambiguity. For instance, I agree that it would have been more prudent had the judge not instructed Derden at one point not to look at the jury. Nevertheless, the court was acting within his authority to make some comment, because Derden had begun a speech, wholly unresponsive to the prosecutor's question, directly trying to appeal to the jury.[2] Repeatedly, Derden's

---

**2.** Q: That's a receipt that you had, is that right, Mr. Derden? You testified from a gas ticket that you had, a receipt that you had put nine—so many gallons of gas in your—in your van on—on the ninth of February, is that right?
A: I certainly did, yes, sir.

responses to questioning by the prosecutor and his own attorney had been unresponsive and narrative. The court continuously cautioned Derden about this conduct. The judge had just instructed Derden twice on the preceding page of transcript, and at other times, to answer questions directly. Can we really say in hindsight that the trial court here abused his discretion, much less that the jury became inflamed against Derden because of the judge's instruction?

When, during defendant's closing argument, the court responded to the prosecutor's objection by saying he did not hear defense counsel's argument, this candor might have been regrettable. But in the end the court did not sustain the objection and defense counsel proceeded. The record does not provide a context for this remark; perhaps the judge was reviewing exhibits or otherwise engaged in an activity that legitimately drew his attention from the argument.

Derden also objects to the court's having sustained four objections to his counsel's opening argument. This, too, was raised on direct appeal as an abuse of discretion, and the State Supreme Court found no error under the particular circumstances, not even pausing to write on the matter. The prosecutor's opening argument was extremely brief. Defense counsel could have summarized his contentions with similar brevity by saying that the co-conspirators were all lying, because their stories were completely inconsistent and each had received a deal from the prosecutor in order to "get" Derden. Instead, he embarked on a rambling preview of the likely evidence. Surely the trial judge was entitled to preserve symmetry in the length and style of opening remarks, both to maintain control of his courtroom and because attorneys' statements, however well-motivated, are not evidence.

Finally, the majority repeat instances in which the court admonished defense counsel in various ways during trial. Juxtaposing these comments to highlight their effect is misleading: the trial court transcript, which I have fully reviewed, is 650 pages long. It is virtually impossible to say, reading a long, cold record, that these sporadic remarks so denigrated the defense counsel as to have destroyed the jury's impartiality toward Derden. Derden's trial counsel did not think most of them significant enough to point out specifically in his brief to the Mississippi Supreme Court.[3] Nor, of course, did he object to any of them in the trial court.

Contrary to Derden's charge of trial court bias, the record reveals other instances during trial in which the court aided defense counsel. The court insisted that the prosecutor obtain records not readily available to them of Sherrod's criminal activities in order to assist defense counsel's impeachment. The court also allowed hearsay questioning by defense counsel during a preliminary hearing and at trial. On

---

Q: Now, of course, there's nothing on that thing to tell us when that was made out, is there, Mr. Derden?
A: Well I've been in jail, ladies and gentlemen, since January twenty, eighty—eighty-five—
THE COURT:
Just a minute. Face the layer and answer the lawyer's questions, and you do not address the jury, you understand? I'm not going to caution you about this again.

3. The numerous appellate points raised by Derden in the Mississippi Supreme Court relative to the fundamental fairness of the trial were: (A) Evidence of fundamental unfairness was adduced at the pretrial hearing; (B) the prosecution's obtaining promises by the jurors to believe the State's co-conspirator witnesses, contributed to the denial of a fair trial; (C) the trial judge's frustrating defense counsel's attempt to make an opening statement contributed to an unfair trial; (D) the trial judge's commenting that neither he nor the jury "cared" about one of the accused's defenses, contributed to the denial of a fair trial; (E) the trial judge's continuous correction of the accused, and admonitions to him in front of the jury, contributed to the denial of a fair trial; (F) the trial judge's admission of the hearsay statement by Richard Dismuke that Derden had not been at the Apollo Club on the night of the burglary in question contributed to the denial of a fair trial; (G) the two and one-half year delay in the trial contributed to the denial of a fair trial; (H) permitting the co-indictee, Pam Smith, to be cross-examined about her failure to come forward with a statement concerning the burglary, contributed to the denial of a fair trial; and (I) permitting the jury to hear evidence of other crimes contributed to the denial of a fair trial.

balance, the court appears to have conducted the trial irreproachably, evenhandedly ruling on both sides' objections.

It is one thing for us, familiar with the personalities in the federal court system, to declare that a court has effectively taken over the prosecution. *See United States v. Middlebrooks*, 618 F.2d 273, 277 (5th Cir.), *cert. denied*, 449 U.S. 984, 101 S.Ct. 401, 66 L.Ed.2d 246 (1980); *United States v. Candelaria–Gonzalez*, 547 F.2d 291, 297 (5th Cir.1977); *United States v. Sheldon*, 544 F.2d 213, 219 (5th Cir.1976); *United States v. Diharce–Estrada*, 526 F.2d 637, 638, 640 (5th Cir.1976). It is quite another if we, never having even met the trial judge or examined his record, condemn the "tone" of his courtroom from the abstract vantage point of an ambiguous record.[4] I am not persuaded that where none of the comments individually attributed to the court is even an abuse of discretion, they acted cumulatively or in tandem with other events to poison the jury against the defendant.

### B.   The Prosecutor

The prosecutor admittedly overstepped his bounds according to Mississippi law when in *voir dire* he tried to commit the jury to evaluate the co-conspirators' testimony like any other. This state law error, the State Supreme Court held, would have been reversible if the trial court had not properly instructed the jury at the end of trial to beware of such testimony. *Derden*, 522 So.2d at 754–755. This cured error was not of constitutional magnitude alone, and it is not sufficient to grant the Great Writ.

The prosecutor also erred in asking Sherrod to reveal Derden as his accomplice in other robberies.[5] But this misstep was immediately corrected by the trial court's instruction to the jury to disregard. If Der-

den had been tried in federal court, a violation of Fed.R.Evid. 404(b) might have occurred—neither a constitutional error nor reversible in itself, particularly because of the trial court's prompt curative instruction. *See, e.g., Woodruff v. Lane*, 818 F.2d 1369,, 1373 (7th Cir.1987); *Sargent v. Armontrout*, 841 F.2d 220, 224 (8th Cir.1988). As it was, the prosecutor attempted to breach a Mississippi rule of evidence. A violation of state evidentiary rules, however, is irrelevant in habeas cases, where the only issue is whether the trial violated constitutional norms. *Hopkinson v. Shillinger*, 866 F.2d 1185, 1197 (10th Cir.1989). Yet, the majority make no effort to show that the prosecutor's conduct was "conspicuously prejudicial"—the standard for determining whether the admission of evidence denied a defendant due process. *Id.; Woodruff*, 818 F.2d at 1373. Instead, the majority summarily conclude that the mere attempted violation of a state rule of evidence "contributed significantly to petitioner's denial of due process."

This conclusion is flawed for two reasons. First, if this error was as significant as the majority believe, certainly Derden should have requested a mistrial. Instead, Derden chose to rest on the trial court's instruction to disregard, strongly suggesting that the prejudicial impact of this error, considered in light of the judge's curative instruction, was minuscule. Second, as was held by our sister circuit courts, the United States Constitution is not infringed by an attempt to introduce testimony excluded only by state evidentiary rules. Such a conclusion improperly gives state rules a constitutional cast.

I do not condone overzealous prosecutorial tactics. Here, however, such tactics were cabined by the trial court's curative instructions, and no mistrial was timely sought by defense counsel. How can our

---

**4.** The Mississippi Supreme Court had the opportunity to consider Derden's fundamental fairness argument and rejected it out of hand, without discussion. Mississippi's highest court is far more likely than we are to know personally the record of the trial judge, the prosecutor and defense counsel and to be able to draw meaningful inferences from this record.

**5.** Although the trial court refused to permit an *in camera* objection to this testimony *before* it was given, one can hardly fault the trial court for abuse of discretion. It was not obvious from the prosecutor's preliminary questions that error was imminently in-the-making, and the court so observed.

antiseptic review of the record find a lack of fundamental fairness that defense counsel wholly overlooked during trial? The charge of prosecutorial misconduct fails as a basis for "cumulative error" habeas relief because our standard of review is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986).

### C. The "Brady" Violation

The alleged *Brady* violation likewise furnishes no assistance to Derden. If the prosecutor had turned over evidence that no police radio call was made on the robbery until 2:00 a.m., it is not clear that such evidence would have been exculpatory. The police might have acted on their report slowly. Other witnesses placed the burglary between 12:00 and 1:00 a.m. If the co-conspirators' and witnesses' sense of the time was incorrect, that does not cast doubt that a burglary occurred, nor does it demonstrate in any greater degree their prevarication about Derden's involvement. I disagree that the evidence on police call sheets was material, exculpatory, or affirmatively suppressed by the prosecution, all of which are prerequisites to a *Brady* claim.

### D. The "Cumulative Impact"

According to my analysis, it is impossible to say that the trial judge abused his discretion except possibly in the relatively minor points of his one admonishment to Derden not to face the jury and the observation that he did not hear a point of defense counsel's argument. Similarly, the trial judge's curative instructions to the jury with respect to the two instances of alleged prosecutorial misconduct significantly reduced the risk of prejudice to Derden. The combination of these events simply does not add up to a violation of due process.

The majority ignore Derden's failure to interpose objections to most of the "errors" by the judge that supposedly resulted in an unfair trial. In doing so, they have deprived the trial court of the opportunity to correct those "errors" in the first instance, and allowed Derden to "ride the verdict" and obtain a reversal on the basis of "hip-pocket" errors.[6] The majority also overlook the fact that the federal courts are committed to the theory that juries can disregard errors when properly instructed. *See Darden,* 106 S.Ct. at 2472 & n. 15 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637, 644, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974); *United States v. Magee,* 821 F.2d 234, 241–42 (5th Cir.1987). Yet, the presence of curative instruction in each alleged instance of prosecutorial conduct plays no role in the majority's analysis of fundamental fairness.

Finally, the majority fail to consider the length of Derden's trial. Isolated errors weigh less heavily than repeated errors that permeate the entire trial. *See, e.g., United States v. Nickerson,* 669 F.2d 1016, 1020 (5th Cir.1980). Given the length and thoroughness of this trial, I find it difficult to imagine that the jurors were so influenced by the judge's and prosecutor's conduct that they would not appraise the evidence objectively and dispassionately. The record fairly establishes that the instances recounted by the majority were aberrations, and not cumulative evidence of a proceeding dominated by passion and prejudice.

### II. The Verdict

The "errors" alleged by Derden cannot rise to constitutional significance unless it is likely that they affected the outcome of trial. The evidence does not support such an inference.

The jury was fully aware that Derden's three co-conspirators who testified against him had each received favorable treatment

---

**6.** It is a nice question, whether, when "cumulative error" is the proposed basis for habeas relief, and a petitioner relies upon instances of judicial bias, he procedurally defaults every individual error that he did not bring before the state courts. *See Coleman v. Thompson,* —

U.S. ——, 111 S.Ct. 2546, 115 L.Ed.2d 640. If this is so, and it seems a likelihood, Derden is confined to the three issues of judicial misbehavior that he raised in the Mississippi Supreme Court. *See* Note 3, *supra.*

from the prosecutors. Turner and Posey also testified that they gave the prosecutor statements about the burglary *before* any plea bargain was reached. The alleged inconsistencies in their testimony related only to the times at which they all arrived back in West Point during the middle of the night, following the attempted burglary. Derden contended it was impossible for Turner to have driven his van on a three-hour odyssey after the burglary was interrupted and then to have gotten back to West Point before Sherrod and Posey, who hitched a ride more directly. That timing inconsistency arose only because the farmer's son who gave a ride to Sherrod and Posey testified that he dropped them off in West Point just after 2:00 a.m. At least two resolutions of this inconsistency could have been reached by the jury other than the exculpatory conclusion that the co-conspirators were lying: the farmer's son read the clock wrong at those late hours; or Turner incorrectly estimated his route and delays during the rainy night.

Other incriminating evidence was in the record against Derden. His van was used in the burglary. He was stopped and ticketed at 3:45 a.m. for not having working tail lights on his van; this was an unusual hour to be on the road. The alibi, that he and Pam Smith were measuring for carpet until nearly midnight at houses in Houston, Mississippi that they could not later identify, seems strained. The prosecutor cross-examined Derden most effectively on his alibi testimony, as even defense counsel admitted at the outset of his closing argument. And, with defense counsel's approval, the court admitted Derden's statement which contained hearsay that the owner of the Apollo Club, a former partner of Derden's, had not seen him on the night of the robbery. This contradicted Derden's alibi.[7]

The case against Derden thus posed a swearing match between Derden and his defense witnesses and the co-conspirators, together with some objective evidence. It was the jury's duty to resolve the dispute, and it can hardly be argued that no rational jury could have decided against Derden on the record.

### III. Conclusion

From the events recounted so vehemently by the majority in support of their conclusion, I draw a starkly different lesson. To the extent trial court errors occurred, they were either addressed during trial and were thus cured or were not thought as significant by defense counsel then as they are now portrayed. If there were no errors, there can be no "cumulative error" grant of habeas relief. *Mullen*, 808 F.2d at 1147. Even assuming that one or two of these events constituted error, however, the unanimous Mississippi Supreme Court and the federal district judge agreed with my view of the fundamental fairness of the proceedings, although the magistrate judge and the panel majority do not. It would seem that when reasonable minds differ about the cumulative effect of highly disparate events at trial, a finding that favors the regularity of the state court proceedings is warranted. *Cf. Taylor*, 436 U.S. 478, 487 & n. 15, 98 S.Ct. 1930, 1936 & n. 15, 56 L.Ed.2d 468 (errors were all related toward diminishing the standard of proof).

The majority state that this case is fact-specific in warranting habeas relief. I disagree. Its impact extends further because it suggests that an aggregation of adverse trial events may, given the right federal tribunal, garner a writ of habeas corpus. The Constitution does not guarantee a perfect trial, however, only a fair one. *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). When we grant the writ for lack of fundamental fairness, we must delimit those cases much more carefully than, I fear, has been done here. I respectfully DISSENT.

---

7. Defense counsel prominently relied on the "erroneous" admission of Dismuke's hearsay statement in his state appeal brief and his habeas application to the district court. He erred in so doing, as the record shows.